Milligan, J.,
delivered the opinion of the court:
The claimant avers in his petition that he is a native of Ireland, and subject of Great Britain, and that about the last of May or first of June, 1864, he obtained certain permits from the special agent of the Treasury Department at Natchez, Miss., to purchase cotton in Jefferson and Claiborne Counties in said State; and that, soon after, he proceeded to Jefferson County,, and on or about the 33th of June, 1864, he confirmed contracts of purchase, set out at length in the petition, previously made by his agent, C. H. Foreman.
All the purchases, as alleged in the petition, were made under the permits before referred to, but, “owing to the unsettled condition of the country, the cotton could not be brought down to New Orleans until February, 1865.”
When the cotton was brought down, as averred in the petition, it came consigned to the claimant’s factor, George Coppel, at New Orleans, “ and was by him received in due course, and sold, on the 2d and 14th of March, 1865, the 44 bales at 70 cents per pound, amounting to $13,214.30; and on the 17th of Marchj 1865, the 100 bales, at 63 cents per pound, amounting to $25,563.50.”
It is further charged that “said George Coppel, his factor, was compelled to pay to O. N. Cutler, the United States purchasing agent at New Orleans, a drawback or tax of 25 per cent, of the said gross proceeds, being $4,286.79 and $9,327.45 respectively, amounting together to $13,614.24; that said payment was made under protest of his factor and himself, and the said amount he is advised and believes has been paid into the Treasury of the United States, and credited to the captured and abandoned property fund.”
Under these general averments this suit was brought to reclaim the sum of $13,614.24, which, it is alleged, is in the Treasury and credited to the captured and abandoned property fund.
The facts on which the case rests are found to be as follows:
The claimant is a British subject, and he appears at no time during the late rebellion to have violated the neutrality laws.-
*409 A special license was issued to the claimant on the 6th of June, 1864, by W. M. Burnet, assistant special Treasury agent at Natchez, by which he was authorized to purchase 500 bales of -cotton within the counties of Claiborne and Jefferson, in Mississippi, with permission to transport the same, by way of the Mississippi Biver, to New Orleans. Prior to this time, on the 14th of January, 1864, a similar permit had been issued to one A. Van Camp to purchase 250 bales of cotton in Claiborne, Jefferson, Wilkinson, and Adams Counties, Mississippi. The latter permit was limited to thirty days, but it was renewed from time to time, the last renewal being on the 14th of July, 1864. Both permits contained a provision that any violation of the regulations of the Treasury, &c., should work an immediate revocation, and thenceforth all purchases, transportations, and sales under it should be unlawful.
On the 15th of July, 1864, the following indorsement was made on the Van Camp permit:
“ I hereby appoint W. S. Millar my lawful agent to buy cotton for me under the within permit, and forward and ship the same to market.
“A. VAN CAMP.
“Indorsed: Approved.
M. L. KENNET.”
Some time in May, 1864, the claimant purchased, through his agent, Charles H. Foreman, of A. W. Sutphin, 60 bales of cotton on his plantation in Jefferson County, Mississippi; and about the middle of June, 1864, 44 bales of Mrs. Valentine, on her place in Claiborne County, Mississippi; and still another lot of Mr. Baldwin, between the first and middle of June, same year, on his plantation in said Claiborne County.
On the 13th of May, 1864, the claimant registered as his property, at the British consulate at New Orleans, where he then resided, 75 to 100 bales of cotton, then stored on the plantation of A. W. Sutphin, in Jefferson County, Mississippi; and on the 27th of June, 1864, 140 bales, then stored .on the plantation of Judge Baldwin, in Claiborne County, Mississippi; and, at the same time, 92 bales, then stored on Mrs. Valentine’s place, in said county of Jefferson.
It is claimed that these purchases were made under the claimant’s permit. The agent, at the time of the purchase, re *410 sided in Jefferson County, Mississippi, and be was supplied with money by the claimant, who then resided in New Orleans, to pay for the cotton bought for him.
The several lots so purchased were either partially or wholly paid for at the date of purchase by the agent, and each lot left on-the plantations where purchased, at the risk of the claimant, from the date of the purchases until about the 23d of February, 1865, when it was brought to the river by the agent.
The places where the cotton was purchased were, at the time of the purchases, about sixteen miles from the Mississippi River, and under the control of the rebel forces, and the cotton could not be brought in at an earlier date in consequence of their scouts.
On or about the 23d of February, 1865, aforesaid, the cotton was brought to the river, where 100 bales at Cole’s Creek Landing were received on claimant’s permit, on board the Mittie Stephens, and 44 at Rodney.
Claimant was on the steamer when the cotton was put aboard, exercising control over its shipment. It was consigned to George Coppel, the acting British consul at New Orleans.
After its arrival at New Orleans, it was received by the consignee, and by him sold to O. N. Cutler, the United States purchasing agent at that place. The sale was in two lots, one of 3 00 bales, and the other 44 bales. On these lots the claimant’s consignee was required to pay 25 per cent, on the appraised value of said cotton, Government charges, &c., which, on the 100 bales, amounted to $9,327.45, and on the -44 bales to $4,286.29, making together $13,613.74, which, less the expenses and charges, was paid into the Treasury.
On the foregoing facts the claimant’s counsel insists with much ingenuity that his client is entitled to reclaim the sum of $13,613.74 thus paid by his factor to the United States purchasing agent. But without going into the question of duress, or any of the other refined theories of the case relied on by the claimant, we think the case as presented in the record before us is a plain one, and free from all difficulties. It is neither complicated in its essential facts, nor involved in the law governing its decision.
All the cotton appears to have been purchased in Jefferson aiid Claiborne Counties, in Mississippi; and the date of the several purchases extended from May to the middle of June, *411 18C4. The purchases, as claimed in the petition and insisted on in the argument, were all made under the claimant’s permit, which issued on the Gth of June, 18G4.
At the date of these several transactions the claimant resided at New Orleans, within the lines of actual military occupation by the United States forces; and the cotton was purchased beyond these lines, in Jefferson and Claiborne Counties, in Mississippi.
Admitting, for the purposes of this ease, that a permit was issued to the claimant, which purported to grant him authority to buy cotton either in Jefferson or Claiborne County, beyond the military lines of Federal occupation, could he under such license make valid purchases'? This is not an open question. Lane’s Case (7 C. Cls. R., p. 97) puts this question completely at rest. It is there distinctly held that neither the Act 13th July, 1861, nor the Treasury regulations thereunder, authorized commercial intercourse across the military lines.
Turning from the Act 13th July, 1861, and the regulations of the Treasury Department of the 31st of March, 1803, and of the 12th of September following, to the Act July 2, 1864, the court say:
“It is contended that the eighth section of this act, which says that it shall be lawful for the Secretary of the Treasury, with the approval of the President, to authorize agents to purchase for the United States any products of States declared in insurrection, conferred the power to license trading within the military lines of the enemy.”
If this were so, and it was the intention of Congress to allow this trading, providing it was done on Government account, why was it not manifested by a specific provision in the law ? Why leave such an important change of policy to be inferred from the general words of the act, and the absence of express words of limitation1
That the Secretary of the Treasury, who, it is natural to suppose, having the administration of the law in his hands, was, before it was passed, consulted about it, did not give this interpretation to it, is very clear; for, within a short time after the passage of the act, he adopted, with the approval of the President, a new series of rules regulating commercial intercourse, which were intended to supersede all others, and the third rule absolutely prohibits all intercourse beyond our *412 military lines, and declares, further, “that no permit will be granted for the transportation of any property to any place under the control of the insurgents.”
The facts of the case in hand bring it directly under the principles here announced, and deny the claimant all right of recovery in this action. His title to the property sued for fails; and it does not matter whether the alleged purchases were made under the permit, or through his agent within the insurgent district $ they were equally contrary to the spirit and letter of the non-intercourse acts, and therefore unlawful and void.
The petition must be dismissed.