## MONTGOMERY *v.* UNITED STATES.

1. B., a loyal citizen of the United States, at New Orleans, had been, prior to the rebellion, agent of a planter, J., who during the rebellion was a rebel, in the rebel region and lines, within which his plantation was. B. had been in the habit before the war of making advances to J. to assist him in getting forward his crops; and by an agreement with J. was to have a lien on the crops for the advances, and a power to sell for repayment. After the war broke out, B., at New Orleans (now reduced to the possession of the Federal government), *describing himself as "agent,"* of J., agreed to sell to M., a British subject, also domiciled in New Orleans, a crop on which he had made advances above its value, belonging to J., and then on his said plantation : *describing the property as J.'s,* and not in any way referring to his own lien on or interest in it. *Held* that the sale was void, as being a trading with a public enemy.

2. Every kind of trading or commercial dealing or intercourse, whether by transmission of money or of goods, or orders for the delivery of either, between two countries at war, directly or indirectly, or through the intervention of third persons or partnerships, or by contracts in any form looking to or involving such transmission, is void.

APPEAL from the Court of Claims; the case being thus :

R. H. Montgomery, a British subject domiciled in New Orleans before and during the war of the rebellion, after

the capture of that city by the forces of the United States, in April, 1862, made a written agreement with J. W. Burbridge, a loyal person residing in that city, doing business as Burbridge & Co., and the factor and agent of one Leo Johnson, a planter, residing at that time in the parish of La Fourche, Louisiana, and *within the enemy's lines ;* by which Burbridge & Co., as " *the agents* of the said Johnson, declared that they had sold, and thereby did sell unto the said R. H. Montgomery, ' *the following crop belonging to said Johnson, on his plantation, in the parish of La Fourche, near La Fourche Crossings,* to wit: 605 hogsheads of sugar, 700 barrels of molasses, and 300 barrels of rum, at the following prices, to wit: For the sugar, at 4½ cents per pound; for the molasses, at 20 cents per gallon; and for the rum, at 50 cents per gallon, the weight and quantity to be determined at the time and upon the delivery thereof in New Orleans.' "

Montgomery paid to Burbridge & Co. $5000, the receipt whereof was declared in the agreement to be thereby acknowledged, " and accepted as so much on account of the first sugar, molasses, or rum delivered to him, said Montgomery, as aforestated; the balance to be paid by said Montgomery at each future delivery of said sugar, molasses, and rum." The sum of $9000 was paid afterwards.

Burbridge, on the day of the contract, signed an order directing the overseer of Johnson's plantation " to deliver to the order of the said R. H. Montgomery the entire crop of sugar, molasses, and rum contained in the sugar-house, purgeries, &c., on the said plantation, the same," said the order, " having been sold to him this day."

All the sugars and produce mentioned by the agreement having, as already said, at the time when it was made, been within the rebel lines of occupation, no actual delivery or possession was taken of any part, nor any attempt made to deliver or take possession until the sugar was brought, some time afterwards, into the Federal lines by the forces of the United States.

On the 9th of September, 1862, General Butler then commanding at New Orleans, issued a proclamation whereby,

among other things, all the property within the district
known as the district of La Fourche, and including the
plantation where the sugar in question then was, was seques-
trated, and all sales and transfers of the same forbidden and
declared to be invalid. A commission was appointed to
take possession of the property and make an accurate in-
ventory of the same, and to gather and collect all personal
property covered by the proclamation and to dispose of it in
the manner therein provided. Immediately after the issuing
of this order the government forces took possession of John-
son's plantation and delivered to the commission about 500
hogsheads of sugar (being a portion of that embraced in the
contract), which they sold; paying the net proceeds, amount-
ing to $37,351, into the Treasury of the United States.

Burbridge & Co., for two years before May, 1862, had
been the factors and agents of Johnson, and had made ad-
vances to him to enable him to secure his crops, and John-
son owed them for such advances, prior to December 9th,
1862, $131,000. Burbridge & Co., as a part of the original
agreement made between them and Johnson, were to have
a lien on, and were authorized to make sale of, the crop of
sugars and produce on the plantation for the purpose of re-
imbursing themselves the amount of their advances. The
sugars, &c., in question were of the crop of the year 1860
and 1861.

Montgomery now filed in the Court of Claims a claim for
the proceeds of the sugar, under the Captured and Aban-
doned Property Act of March 12th, 1863, which enacts,
among other things :

"That any person claiming to have been the owner of such
abandoned and captured property, may at any time within two
years bring his action. . . . And on proof, to the satisfaction of
said court, of his ownership of said property, and of his right to
the proceeds thereof, may recover," &c.

The Court of Claims held that the appellant was not en-
titled to recover. They said, among other things:

"A careful examination of the agreement between Burbridge

& Co. and the claimant (admitting the authority of Burbridge & Co. to make it), satisfies us that no ownership of the property vested in Montgomery. The transaction did not constitute a sale, but only an executory contract for a future sale and delivery. . . . Where a sale is agreed upon of goods, and anything remains to be done to ascertain the quantity or price, the property in such case does not vest in the buyer until this is done."

The court also assumed, apparently, that property situated outside of the Federal lines, and within the rebel lines, was not a lawful subject-matter of sale, between parties such as these were.* The court accordingly dismissed the petition, and Montgomery now brought the case here on appeal.

*Mr. T. J. D. Fuller, for the appellant:*

Had the Court of Claims in its observation about executory contracts said that "where a sale is agreed upon of goods, and anything remains to be done BY THE VENDOR to ascertain the quantity or price, the property in such case, does not vest in the buyer until this is done;" it would have stated the law truly, but it omitted the words which we put in capitals; and because of this omission—this oversight, or failure to make a proper distinction, found in the authorities,† it committed error.

Now, reading this contract in the light of authorities, and the order of delivery, there was nothing remaining to be done by the vendors.

As to the second point. The idea meant to be here presented by the Court of Claims is, of course, that the contract made a trading with the enemy in time of war. But Burbridge & Co. had a lien on the property far above all its value. They were in truth owners, though, speaking technically, we say that they had a power coupled with an interest in and over the produce of the plantation; and as factors had authority to sell the sugars to reimburse themselves for the advances previously made. But, as already

---

* See 5th Court of Claims Reports, 658.

† Crofoot *v.* Bennett, 2 Comstock, 258; Leonard *v.* Davis, 1 Black, 483.

said, being far in advance above the value of the crop, they were in truth owners of it; acting for themselves. They could be acting for nobody else. Johnson had no real interest in the crop. *Their* interest was supreme, for from it only were they likely to get their advances at all. Now, *they* were not enemies; contrariwise, they were subjects and friends. Reading the contract in the light of then existing facts, the expressions " *agent of Johnson,*" " *the property of Johnson,*" are merely words descriptive of the property sold, to identify it. Johnson was no party to the sale; his assent or dissent would not in anywise affect the interest of the parties to it.

*Mr. G. H. Williams, Attorney-General, and Mr. C. H. Hill, Assistant Attorney-General, contra.*

Mr. Justice STRONG, delivered the opinion of the court.

Whether the contract under which the appellant claims to have become the owner of the sugar, molasses, and rum was so far executed that, without more, it would have passed the property, had it been legal, it is unnecessary to consider; for we are of opinion that, whether executed or executory, it was illegal and void. It was a clear case of trading with a public enemy. The subject of the contract was personal property within the Confederate lines. It was a crop at the time on the plantation of Leo Johnson, in the parish of La Fourche, near La Fourche Crossings. It belonged also to Johnson, who was then domiciled in the enemy's territory, and who was himself an enemy. This is expressly stated in the contract itself. The appellant's right, therefore, is founded upon an attempted purchase, during the war, from an enemy, of enemy's property, in direct violation not only of the laws which always prevail in a state of war, but also in violation of the acts of Congress. It is vain to contend that any right can be acquired under such a contract.

It is true the sale was negotiated by agents of Johnson, living outside of the enemy's territory, but it was not the less his act because it was done by those acting under his

authority. Nothing is clearer, says President Woolsey,* than that all commercial transactions of whatever kind (except ransom contracts), with the subjects, or in the territory of the enemy, whether direct or indirect, as through an agent or partner who is neutral, are illegal and void. This is not inconsistent with the doctrine that a resident in the territory of one belligerent may have in times of war an agent residing in the territory of the other belligerent, to whom his debtor may pay the debt, or deliver property in discharge of it. Such payments or deliveries involve no intercourse between enemies. The present case exhibits a transaction not wholly within enemy's territory, but a sale from an enemy to a friend. If that can be made through an agent, then the rule which prohibits commercial intercourse is a mere regulation of the mode of trade. It may be evaded by simply maintaining an agency in the enemy's territory. In this way every pound of cotton or of sugar might have been purchased by Northern traders from those engaged in the rebellion. Perhaps the rule is stated too broadly in Woolsey's Commentaries, and in many elementary books, but it is certain that "every kind of trading or commercial dealing or intercourse, whether by transmission of money or of goods, or orders for the delivery of either between two countries (at war), directly or indirectly, or through the intervention of third persons or partnerships, or by contracts in any form looking to or involving such transmission," are prohibited.† The contract in this case contemplated the delivery of the sugar, molasses, and rum at New Orleans, then within the Federal lines. There, on its being weighed and measured, payment was to be made to Johnson's agents. If this be allowed, the enemy is benefited and his property is protected from seizure or confiscation.

It has been argued that because Burbridge & Co., the agents, had a lien upon the property for advances made by them, and had also a power to sell for the repayment of their advances, the sale which was made ought not to be re-

---

\* International Law, § 117.

† Kershaw *v.* Kelsey, 100 Massachusetts, 561.

garded as a sale by Johnson. Yet the only authority they had to sell at all, resulted either from express power given to them by the owner, or from the relation to him in which they then stood. They might have sold their lien, or the debt secured by it; and had they done so, the sale would have involved no trading with the enemy. But they undertook to sell Johnson's property, describing it as such in the instrument of sale, and describing themselves as Johnson's agents. Very clearly, in effect, the parties to the transaction were the appellant and a public enemy. For this reason the judgment is

AFFIRMED.