Bichaedson, J.,
delivered the opinion of the court:
The facts proved in this case, as found by the court, leave no doubt that, at the time of making the purchases within the rebel lines during the rebellion, the claimant’s domicile was in the city of New Orleans,' then and ever after during the war held by the military forces of the United States. Before the war his domicile was in that city, and he resided and carried on there a commercial business, as a partner in a commission-house. There is no evidence of any change of domicile or of a dissolution of his partnership. According to well-settled principles, the presumption of law is that a domicile, once acquired, continues until it is proved to be changed, and that the burden of proof is upon him who relies upon such change. It was not until October, 1862, that the claimant is proved to be within *388 tbe rebel lines, in tbe parish of Saint Landry, where be was then acting as agent of tbe rebel government for tbe exchange of Confederate bonds for Confederate notes, and bad an office for that purpose at Opelousas, and at tbe same time was purchasing, on bis own account, the cotton claimed in bis petition. This is not inconsistent with bis still maintaining bis domicile in New Orleans, especially as it does not appear that be bad a fixed borne or residence of any kind or a place of general commercial business in tbe parish of Saint Landry or elsewhere within tbe rebel lines. In January, 1866, be is found again residing in New Orleans, and in May, 1867, according1 to bis petition, duly sworn to, he was a resident of that city, and then claimed that be bad at all times borne true faith and allegiance to tbe United States. In all tbe proceedings, from tbe original petition to the findings of fact, there is no claim set up that be ever bad a fixed residence or domicile in any other place than New Orleans. That being tbe case, tbe main question of law presented for our determination is whether or not the purchases of cotton made by tbe claimant personally within tbe rebel lines, while bis legal domicile was in New Orleans, were valid and not in violation of public policy. If they were valid, then tbe claimant is entitled to recover; otherwise, judgment must be for tbe defendants.
When tbe Federal forces obtained complete control of New Orleans, soon after tbe 27th of April, 1862, tbe inhabitants were no longer held to be in insurrection, and commercial intercourse between them and tbe inhabitants of other parts of tbe United States not in rebellion was permitted, while between them and tbe inhabitants of such portions of Louisiana and other States as remained in control of the insurgents such intercourse was strictly prohibited. , The President, in pursuance of authority conferred upon him by the Non-intercourse Act July 13,1861, (12 Stat. L., 257,) on the 16th of August of that year issued his proclamation (12 Stat. L., 1262) declaring that the inhabitants of the States of Georgia, South Carolina, Virginia, North Carolina, Tennessee, Alabama, Louisiana, Texas, Arkansas, Mississippi, and Florida, (except the inhabitants of that part of the State of Virginia lying west of the Alleghany Mountains, and of such other parts of that State and the other States before named as might maintain a loyal adhesion to the Union and the Constitution, or might he, from *389 time to timé, occupied and controlled Toy forces of the United States engaged in the dispersion of the insurgents,) were in a state of insurrection, and all intercourse between tlie same and the inhabitants thereof, with the exceptions aforesaid, and the citizens of the other States and other parts of the United States was unlawful and would remain unlawful until such insurrection should cease or be suppressed. The Supreme Court has held that “ military occupation, to work this exception, must be actual; that is to say, not illusory, not imperfect, not transient, but substantial, complete, and permanent;” and that “ the military occupation of the city of New Orleans may be considered as substantially complete from the date of” the proclamation of General Butler of May 1, 1862, which was issued on the Gth of May, and which “declared the city to be under martial law, and announced the principles by which ttíe commanding general would be guided in its administration.” (The Venice, 2 Wall., 258.) On the 12th of May, 1862, the President, by proclamation, (12 Stat. L., 1263,) declared that the blockade of the ports of Beaufort, Port Boyal, and New Orleans should cease and determine from and after the 1st day of June then next, and that commercial intercourse, with some exceptions as to articles contraband of war and other matters, might be carried on with those ports under certain specified limitations. On the 2d of April, 1863, the President revoked the exceptions contained in his proclamation of August 16,1862, but declared the same States therein mentioned to be in insurrection, “ except the forty-eight counties in Virginia' designated as West Virginia, and except also the ports of New Orleans, Key West, Port Boyal, and Beaufort in North Carolina.” This did not alter, but confirmed, the previous status of New Orleans. Thus the citizens of New Orleans were from the 1st of May, 1862, to the close of the rebellion, to all intents and purposes, in law, inhabitants of loyal territory, with no more right to have commercial intercourse with the public enemies in insurrectionary States and parts of States than had the inhabitants of New York, Boston, or Philadelphia.
The time of the claimant’s going from New Orleans into the parish of Saint Landry, whether before or after the 27th of April, 1862, when the United States forces took possession of that city, and it ceased to be insurrectionary territory, is not expressly proved, but must be determined by the presumption of *390 law; and as be might have different rights, and be subject to different obligations to some extent, if he went before or after that date, we will consider his claim under each of those aspects of the case.
In the case of The William Bagley, (5 Wall., 408,) Mr. Justice Clifford, in the opinion of the court, which was delivered by him, says : u The duty of a citizen, when war breaks out, if it be a foreign war, and he is abroad, is to return home without delay; and if it be a civil war, and he is resident in the rebellious section, he should leave it as soon as practicable, and adhere to the regularly established government.” Applying this rule to the present case, if the claimant were in the parish of Saint Landry when the city of his domicile was taken possession of by the Federal Army, and became loyal territory by virtue of the exception in the proclamation which we have cited, it was his duty to leave as soon as practicable-, return to his home, give in his adhesion to the established government, and transact no further business with the public enemies beyond the Federal lines.
In Ealer v. The United States (5 C. Cls. R., 708) this court held that a “ citizen of a loyal State, involuntarily detained during the rebellion within the Confederate lines, may, with his earning's, buy and sell, acquire and dispose of property, so long as he gives neither aid nor comfort to the rebellion, and so long as he brings nothing within and carries nothing without the Confederate lines.”
It does not appear that the claimant involuntarily remained within the rebel lines, or that it was not practicable for him to return to New Orleans at any time within the six months which preceded his purchases, after the capture of that city. Voluntarily remaining in the territory of the enemy, in violation of his duty to his country, conferred upon the claimant no rights of commercial intercourse with the disloyal inhabitants of that territory.
, But the proof being that the claimant’s domicile, residence, and commercial business were in New Orleans before the war, we think the presumption of law is that he remained there personally until about the time he is proved to be in the parish of Saint Landry. The burden of proof is upon him to overcome that presumption, as it is to overcome the presumption that his domicile, once proved to have been there, continued *391 iii that city. This presumption is greatly strengthened by the fact that it does not appear that he was in that parish until six months after the capture of New Orleans, or that he had any place of business there except an office for the exchange of Confederate bonds for Confederate notes. Where was he during those six months % And where was he when the city of his domicile was captured'? These were facts within his own knowledge and his own means of clear and unquestionable proof. As he offered no evidence to the contrary, we are led to the conclusion that he was in the place of his domicile when it was taken possession of by the Federal Army ; that he subsequently crossed the military lines and went into the territory •of the insurgents, where he made the purchase as set forth in the findings. And that brings his case directly within the principles laid down by the Supreme Court in Lapéne & Ferré’s Case, (17 Wall, 602, 9 C. Cls. B., 31.)
The learned judge who delivered the opinion of the court in that case says:
“All commercial contracts with the subjects or in the territory of the enemy, whether made directly by one in person, or indirectly through an agent, who is neutral, are illegal and void. This principle is now too well settled to justify discussion. (Woolsey’s Int. Law, § 117 ; Montgomery v. The United States, 15 Wall., 395, 8 C. Cls. R., 82.) No property passes and no rights are acquired under such contracts.
“In Ma'rch, 1862, the whole of the State of Louisiana was in the military possession of the Confederate forces. Intercourse between the inhabitants of the different portions thereof was legal, and contracts made between them were legal.
“ On the 27th of April, in the same year, the city of New Orleans was captured by the military forces of the United States, and thereafter remained under their control. From that time commercial intercourse between the inhabitants of that city and the inhabitants of other portions of the State of Louisiana which remained under the Confederate rule became illegal. Ordinarily the line of non-intercourse is the boundary-line between the territories of contending nations. The recent war in the United States was a civil war, in which portions of the same nation were engaged in hostile strife with each other. The State of Louisiana, although one of the United States, was under the control of the Confederate government and their *392 armies, and was an enemy’s country. While the city of New Orleans was under such control it was a portion of an enemy’s country. When that city was captured by the forces of the United States, the line of non-intercourse was changed, and traffic before legal became illegal. The line was that of military occupation or control by the forces of the different governments, and not that of State lines. This principle was expressly decided in Montgomery’s Case, above cited.”
This review of legal principles by the learned judge applies with much force to the case now under consideration, and, upon those principles of law, the facts in this case are more decidedly against the claimant’s right to recover than were those in Lapéne & Ferré. In that case the claimants in New Orleans, when the whole State of Louisiana was rebel territory, sent their clerk into the interior with money wherewith to purchase for them sugar and cotton, and afterward, but while the rebels still held New Orleans, forwarded by a messenger other money to be used by him for the same purpose. After the capture of that city the clerk purchased the cotton which was the subject of suit. While the court held that the agency was terminated by the.hostile position of the parties, it did not rest the decision upon that point alone, but held also that the u purchase gave effectual aid to the enemy by furnishing to them the sinews of war. It was forbidden by the soundest principles of’public law. The purchaser obtained no title to the cotton, and has no claim against the Government for its capture.” And yet.the clerk was within rebel territory before and after the time of the capture of New Orleans, received no money thereafter, but made-the purchases with money which was delivered to him when such delivery was legal and valid. In the present case the claimant, in like manner a citizen of New Orleans, either remained within the rebel lines where he was at the time of the capture of that city, as did the agent of Lapéne & Ferré, or went there subsequently, and made his purchases with money which it does not appear that he obtained by the collection of debts or the sale of property. If the hostile position of the parties, caused by the capture of New Orleans, terminated the-agency of Lapéne & Ferré’s clerk, so it terminated the right of the claimant in this case to have commercial intercourse with the inhabitants of the parish of Saint Landry. (Grossmeyer’s Case, 7 C. Cls. R., 129, 9 Wall., 72 ; Ensley’s Case, 6 C. Cls. R., 282, 9 C. Cls. R., 11; Lane’s Case, 8 Wall., 185, 7 C. *393 Cls. R., 197; Millar’s Case, 8 C. Cls. R., 407; Montgomery’s Case, 15 Wall., 395, 8 C. Cls. R., 82; Coppell v. Hall, 7 Wall., 542.)
Although public enemies, within their own disloyal territory, have a right to make contracts among themselves, and such contracts are held valid, we do not think the claimant acquired, as against the United States, any right of commercial intercourse with such enemies by leaving the city of his domicile and residence after it had been sis months in possession of the Federal forces, and, by the President’s proclamation, was no longer held to be in insurrection, crossing into insurgent territory, and there accepting office under the Confederate government, as agent for the exchange of its bonds for currency. If thus accepting office under the Confederacy rendered his 'purchases valid, then he was in better condition than other inhabitants of New Orleans who remained loyal; and by cbmmitting two disloyal acts he gained a right of action against the United States which he would not have possessed had he committed but one of them.
Since the foregoing was written, the Supreme Court has rendered a decision in Mitchell v. The United States, (ante,) which, in connection with the case of Lapéne efe Ferré, supports the conclusions which we had reached. Mitchell lived in Louisville, Ky., where he was engaged in business. In July, 1861, he procured a pass from the military authorities and went through tbe army lines into insurrectionary territory, where he remained until the latter part of 1864. While in the Confederate States he transacted business, collected debts, and purchased cotton, which was the subject of the suit. The court held that his domicile remained in Louisville; that, as an inhabitant of a loyal State, it was unlawful for him' to make contracts with the inhabitants of disloyal States; that his purchase of the cotton involved the same legal consequences as if it had been made by an agent whom he sent to make it; and that he acquired no title to the cotton so purchased. The court say that the case turns upon the point that Mitchell had his domicile in loyal territory while his purchases were within the lines of the enemy, and they re-affirm the principles that a domicile once acquired is presumed to continue until it is shown to have been changed, and that where a change of domicile is alleged, the burden of proving it is upon the person making the allegation.
On principle and authority, we are of opinion that this claimant is not entitled to recover, and his petition is dismissed.