Richardson, Oh. J.,
delivered the opinion of the court:
Jurisdiction of this case is conferred upon the court by the following act of Congress:
“AN ACT for the relief of the estate of C. M. Briggs, deceased.
uBe it enacted, etc., That the Court of Claims is hereby given, subject to the proviso hereinafter mentioned, like jurisdiction to hear and determine the claim of the legal representatives of C. M. Briggs, deceased, for the proceeds of four hundred and fifty-five bales of cotton, now in the Treasury of the United States, alleged to have been owned, in whole or part, by said Briggs, as is given to said court by the acts of March twelfth, eighteen hundred and sixty-three, and July second, eighteen hundred and sixty-four, upon petition to be filed in said court at any time within two years from the passage of this act, any statute of limitations to the contrary notwithstanding;
u Provided, however, That unless the said court shall, on a preliminary inquiry, find that said Briggs was in fact loyal to the United States Government, and that the assignment to him hereinafter mentioned was honafide, the court shall not have jurisdiction of the case, and the samé shall, without further proceedings, be dismissed;
“ And, provided further, That if the court shall find that the alleged assignment from one JVIorehead to said Briggs, of date April eighteenth, eighteen hundred and sixty-two, under which said Briggs claimed said cotton, was intended only as security to said Briggs for indebtedness, and against contingent liabilities assumed by him for said Morehead, judgment shall be rendered for such portion of the proceeds of said cotton as will satisfy the ■debts and claims of said Briggs, to secure which said assignment was given;
*134 11 Provided, Said judgment shall not be paid out of the general fund in the Treasury arising from the sale of captured and abandoned property, but shall be paid out of the special fund charged to and accounted for by Captain G-. L. Fort, assistant quartermaster at Memphis, arising from the sale of the two-thousand two hundred and nine bales of cotton received by him, with which claimant’s cotton was intermingled, said claimant to receive only the proportion which his cotton bears to the-net proceeds accounted for by said Fort.” [June 4, 1888, Oh» 348, Stat. L., 1075.]
The act revives in favor of the claimant the jurisdiction given to the court by the Adandoned or Captured Property Act of March 13, 1863 (12 Stat. L., 820), removing the limitation of time for bringing actions which had long since expired, and allowing the claimant two years from the passage of the latter act in which to bring suit in this court.
The only other departures from the terms of the Abandoned or Captured Property Act are that the claimant is required to prove that the assignment under which he claims title to the cotton in question was bona fide; that if the court finds the assignment was intended only as security for indebtedness and certain contingent liabilities the measure of damages shall be only sufficient to satisfy the debts and claims to secure which the assignment was given, and that any judgment recovered shall be payable not out of general proceeds of the abandoned or captured property, but out of a designated part of the same.
In all other respects the action is subject to the provisions of the act of 1863 and its amendments, as interpreted and construed by the courts.
That act, in section three, thus provides:
“And any person claiming to have been the ownerof any such abandoned or captured property may, at any time within two years after the suppression of the rebellion, prefer his claim to the proceeds thereof in the Court of Claims; and on proof to the satisfaction of said court of his ownership of said property, of his right to the proceeds thereof, and that he has never given anyaid or comfort to the presentrebellion,to receive the residue of such proceeds, after the deduction of any purchase money which may have been paid, together with the expense of transportation and sale of said property, and any other lawful expenses attending the disposition thereof.”
In numerous decided cases under that act it has been held that the validity of the claimant’s alleged title to the property *135 at the time of seizure must be established, and that if the'title had been acquired through illegal transactions in contravention of that prohibited intercourse between the sections at war with each other, which was declared by statute or contrary to public policy, such asserted title was void as against the United States, and that the claimant relying upon it was not the owner of the property and had no right to the proceeds thereof, within the meaning of the Abandoned or Captured Property Act. Grossmeyer’s Case (9 Wall., 72); Ensley’s Case (6 C. Cls. R., 283), affirmed on appeal without opinion (see 9 C. Cls. R., 11); Lane's Case (8 Wall., 195); Montgomery’s Case (15 Wall., 395); The Elgee Cotton Cases (22 Wall., 183); Desmare’s Case (93 U. S. R., 605), affirming the judgment of the Court of Claims (10 C. Cls. R., 385); Lapene’s Case (17 Wall., 602); Mitchell’s Case (21 Wall., 350); Walker’s Case (12 C. Cls. R., 408), affirmed (106 U. S. R., 413); Whitfield's Case (92 U. S. R., 165).
In the present case the claimant’s testator derived his alleged' title to the cotton by assignment from one Morehead, in the following terms:'
u For and in consideration of money loaned and advanced heretofore by C. M. Briggs, and further valuable considerations by way of suretyship for me by said Briggs, 1 hereby sell and transfer to said C. M. Briggs all bf the cotton on my two plantations in Mississippi, near Egg’s Point and Greenville. Said cotton, so sold, embraces all that I may have, baled and nn-baled, gathered and ungathered. This is intended to cover alL cotton that 1 have now, or may have this year, on said two plantations, supposed to be about 2,000 bales.
c< C. S. Morehead.
. “ APRIL 18, 1862.”
This bill of sale, assignment, or contract was executed and delivered when both parties were citizens and residents of the State of Kentucky. The plantations to be worked were in disloyal territory and had been owned by Morehead from a time anterior to the war. All the cotton, the proceeds of which are now claimed, was still to be raised thereon.
The vital question is presented whether or not Morehead, or Briggs under his contract or assignment, acquired a valid title against the United States to the cotton thereafter in that year to be grown and gathered on those plantations in hostile territory.
It is laid down in Lawrence’s Wheaton on International Law, *136 Part IV, ch. 1, p. 576, edition of 1863, that “ the produce of an enemy’s colony or other territory is to be considered as hostile properry so long as it belongs to the owner of the soil, whatever may be his national character in other respects, or wherever may be his place of residence.” The learned author thus quotes from and reviews the opinion of Sir William Scott on that subject:
“ ‘ It can not be doubted,? said he, ‘ that there are transactions so radically and fundamentally national as to impress the national character, independent of peace or war and the local residence of the parties. The produce of a person’s own plantation in the colony of the enemy, though shipped in time of peace, is liable to be considered as the property of the enemy by reason that the proprietor has incorporated himself with the permanent interests of the nation as a holder of the soil, and is to be taken as a part of that country in' that particular transaction independent of his own personal residence and occupation.’
“It was contended that this rule, laid down with so much precision, did not embrace Mr. Bentzon’s claim, because he had not ‘ incorporated himself with the permanent interests of the nation.’ He acquired the property while Santa Cruz was a Danish colony, and he withdrew from the island when it became British.
“This distinction did not appear to the court to be a sound one. The identification of the national character of the owner with that of the soil in the particular transaction is not placed on the dispositions with which he acquires the soil or on his general national character. The acquisition of land in «anta Cruz bound the claimant, so far as respects that laud, to the fate of Santa Cruz, whatever its destiny might be. While that island belonged to Denmark the produce of the soil, while unsold, was, according to this rule, Danish property, whatever might be the general-national character of the particular proprietor.”
Such is the law of prize. Although the present action is not limited to that law, we learn from it what has an important and material bearing in this suit, that all property produced within enemy’s territory, by whomsoever owned, is stamped with the character of that country, as having contributed directly or indirectly in its production or otherwise to the resources of the enemy, by whom it can be appropriated at any time to hostile purposes. No act of the owner can free such property from that inherent character, nor preveut the laws and power of the enemy from laying upon it contributions to carry on the war.
*137 The subject-matter of the contract or assignment in this case, ■cotton produced in hostile territory during the war, was peculiarly and emphatically hostile property.
In Mrs. Alexander’s Case (2 Wall., 420), Chief-Justice Chase, speaking for the Supreme Court, said :■ “ It is well known that cotton has constituted the chief reliance of the rebels for means to purchase the munitions of war in Europe. It is matter of history that rather than permit it to come into the possession of the national troops the rebel government has everywhere devoted it, however owned, to destruction. The rebels regard it as one of their main sinews of war.”
In the case of Young, trustee, etc., of Collie (97 U. S. R., 59), Chief-Justice Waite, after referring to cotton during the rebellion as “being ‘ potentially an auxiliary’ of the enemy and constituting a means by which they hoped and expected to perpetuate their i>ower,” quotes with approval the above and other language from the same opinion. Again, in the case of Lamar, ex Browne, et al. (92 U. S. R., 194), the same learned Chief-Justice said: “That cotton, though private property, was' a legitimate subject of capture is no longer an open question in this court. It was the foundation on which the hopes of the rebellion were built. It was substantially the only means which the insurgents had of securing influence abroad. In the hands of private owners it was subject to forced contributions in aid of the common cause. * * * It is not too much to say that the life of the Confederacy depended as much upon its cotton as it did upon its men. If they had had no cotton they would not have had, after the first year or two, the means to support war; to a very large extent it furnished the munitions of war, and kept the forces in the field.”
So in Sprott’s Case (20 Wall., 462), Mr. Justice Miller said :
“ It is a fact so well known as to need no finding of the court to establish it, a fact which, like many other historical events, ¡all courts take notice of, that cotton was the principal support of the rebellion so far as pecuniary aid was necessary to its support. The Confederate government early adopted the policy of collecting large quantities of cotton under its control either by exchanging its bonds for the cotton, or, when that failed, by forced contributions.” '
The cotton seized, the proceeds of which are now claimed, ■was not in existence when the contract or assignment was made. It was wholly of the crop afterwards to be grown.
*138 Much active aud expensive work was to be done. Whether or not the seed had been planted at the time the assignment was made does not appear. It was so early in the season, April 18, that if the seed had been planted its growth had scarcely begun. No delivery was then made and none could be made in the state of the crop and in the condition of the country, and none was ever subsequently made.
Cotton is not of spontaneous growth, like wood, which comes to maturity when left to itself. For its production the land must be plowed and prepared, seed must be purchased and planted, the ground must be kept free from weeds, and the cotton must be picked, ginned, and baled, all requiring the employment of labor and the expenditure of money. The labor employed must in this case have been that of persons residing in hostile territory and who in law were enemies. The money expended must have been sent across the lines or procured of enemies by contract of borrowing or of sale of property between them and the owner in a loyal State.
These acts could have been done only by Morehead himself, or through an agent, or at the instance of the claimant’s testator, who was most of all to be benefited by them.
The findings show that in point of fact Morehead, while a citizen of Kentucky, was at his plantations in Mississippi after the war began and left them in charge of agents, who superintended the raising of the cotton and also had the general direction of the affairs of the plantations in the years 1861,1862, and 1863. The exact time when the agents were appointed is not in proof. The instructions given and the powers intrusted to them do not appear, and are only to be presumed from what was done. It is found as a fact that part of the cotton was stored at a place used for the storage of cotton belonging to the Confederacy and for that of individuals who intended to sell to the Confederacy, and was marked O. S. A. Some of it was actually sold to the Confederate government by one of the agents for the purpose of raising money with which to carry on. the plantation.
Thus while the United States forces were seizing cotton wherever found in hostile territory in Older to diminish the revenues and weaken the power of the enemy, Morehead and Briggs were interested in raising a crop of cotton, which of necessity would increase those resources and strengthen that *139 power. It was against public policy that residents of loyal States should have such interest and should contract with each other upon it.
Much of such interest and of such contracting would have destroyed the loyal cause.
In the case of Grossmeyer v. The United States (9 Wall., 75)., brought under the abandoned or captured property act, the Supreme Court held that the plaintiff, a citizen of New York, was not the owner of cotton purchased for him in the enemy’s country by hiso creditor residing therein, whom, after the war began, he had directed to invest the sum due in cotton and hold it for him until the close of the war, and that “ not being the owner of the property he has no claim against the United States.”
Mr. Justice Davis, in delivering the opinion of the court, said:
“We are not disposed to deny the doctrine that the resident in the territory of one of the belligerents may have, in time of war, an agent residing in the territory of the other to idiom Ms debtor could pay Ms debt in money, or deliver to Mm property in discharge of it, but in such a case the agency must have been created before the war began, for there is no power to appoint an agent for any purpose after hostilities have actually commenced, and to this effect are 411 the authorities. The reason why this can not be done is obvious, for while the war lasts nothing which depends on commercial intercourse is permitted. * * * *'
“ Besides, if, as is conceded, Grossmeyer was prohibited from trading directly with the enemy, how can the purchase in question be treated as lawful when it was made for him by an agent appointed after his own disability to deal at all with the insurgents was created ‘l ”
This decision had reference to the Non-intercourse act of July-13, 1861 (12 Stat. L., 255), which the claimant contends does, not apply to the case of raising cotton in the manner this cotton was raised, but applied only to the commercial intercourse of trading with the enemy, in its restricted sense of buying and selling. We can not accept this view. It was as much a violation of that act for Morehead in hostile territory to have agents to work his plantations, with the result that the agents made sale to the Confederate States of part of the cotton raised to obtain means of cultivating the plantations, as were any acts of' Grossmeyer. '
*140 The transactions of Moreliead & Briggs were not only prohibited by the non-intercourse act, but by reason of the peculiar hostile character of the subject-matter of the contract — cotton and its production and situation within enemy’s territory were illegal as against public policy, and in violation of the obligation of all citizens not to do any act through which the enemy ■may obtain power, assistance, or advantage.
Had Morehead owned a manufacturing establishment in disloyal territory at the breaking out of 'the war, he might have •continued the manufacture of arms and ammunition, and have contracted for the sale of the future production” with as much ■legality as to have raised cotton on his plantations in disloyal territory, where it was subject to taxation for continuing the war, as well as to all the laws of the Confederacy, and was within the grasp of Confederate authority to take and use for hostile purposes.
As was said in Walker’s Case (12 C. Cls. R., 408, 430), “ The transactions were throughout, in the language of the .Supreme Court, ‘tainted with the vice of the rebellion,’ and that vice, as against the United States at least, destroy s every contract, makes void every purchase, and bars every claim into which it ■enters.”
The President’s proclamation of pardon and amnesty of De■cember 25, 1868 (15 Stat. L., 711, 712), is of no avail to the claimant. Amnesty threw oblivion over crimes and offenses, but did not disturb pre-existing rights of property. It left untouched past and completed transactions in contracts and property to stand upon their validity at the time of consummation. It did not make valid that title to the cotton which Briggs illegally attempted to acquire in 1862, more than six years before the issue of the proclamation of pardon and amnesty, nor did it .give him a right to its proceeds arising from the seizure and sale ■by the defendants in 1863. Those proceeds, after having been ■held some years to the credit1 of the Treasurer of the United States, were finally “ covered into the Treasury ” by order of a resolution of Congress, March 30, 1868 (15 Stat. L., 251; 21 C. Cls. R., 420). That proclamation removed the bar of disloyalty, and persons who had committed crimes and offenses by disloyal acts might thereafter bring suits in the Court of Claims under the provisions of laws then existing, but it gave no rights ■of property and cured no defects of title thereto.
*141 The court has not passed upon the question whether the assignment relied upon by the claimant was intended as an absolute sale or as a mortgage or pledge, because the judgment is for the defendants on grounds applicable alike to the instrument whichever way it be interpreted.
The opinion of the court is that Morehead had no legal title to the cotton as against the United States; that Briggs, the-claimant’s testator, acquired none by the assignment to him, and that the claimant has no rights to the proceeds in the Treasury.
The petition therefore is dismissed.