BakNey, J.,
delivered the opinion of the court:
This is a suit by the plaintiffs to recover $5,578.89, the amount of certain import duties collected from them by the United States military collector of customs at Manila upon a cargo of rice shipped from Saigon, China, to the island of Cebu, Philippine Islands, in Januarjq 1899, after the signing of the treaty of peace between Spain and the United States, but before its ratification. The plaintiffs are subjects of Great Britain and at the time stated were importers of general merchandise in the Philippine Islands and other ports of the Orient, with headquarters at Manila.
The cargo was shipped upon the Venus, an American vessel flying the American flag, direct from Saigon, China, to the port of Cebu, consigned to the plaintiff firm, and airived on the 29th day of Januar3q 1899. On the 25th day of December previous the Spanish military forces evacuated the island of Cebu, the officers of the civil government leaving at the same time. Within forty-eight hours thereafter the native inhabitants organized a government for the island, the same being a branch of the so-called Philippine republic, of which Aguinaldo was the head. This government continued to administer the civil affairs of the island, including *358 the collection of customs, until the 22d of February following, when possession was delivered to the United States. Upon the arrival of the Venus at the port of Cebu duties upon the cargo were demanded of the plaintiffs by this provisional government, refusing to allow the same to be landed until the duties were paid. In compliance with said demand, but under protest, the plaintiffs paid duties on said cargo in the sum of $5,578.89.
Thereafter the military collector of customs at Manila demanded of the plaintiffs payment to him of the customary duties levied by the military authorities in the Philippine Islands- upon the said cargo landed at Cebu and refused them permission to do further business at the custom-house at Manila until said duties were paid. The claimants thereupon paid the said collector, under protest, the duties thus demanded, which were the same in amount as had previously been paid to the provisional government at Cebu when the cargo was discharged.
It is contended by the defendants (1) that the collection of the duties in question at Manila was a valid and lawful exercise of the war power vested in the military commander of the United States forces in the Philippine Islands; (2) that, even if otherwise, the collection of said duties was fully ratified and confirmed by the act of Congress approved June 30, 1906 (34 Stat., 636), commonly known as the Spooner Act. Both of these contentions are disputed by the plaintiffs.
The rule of international law seems to be well settled that between the high contracting parties the exchange of ratifications has a retroactive effect, confirming the treaty from its date. But a different rule prevails where individual rights of third parties are affected, and as to them it is not considered as concluded until there has been an exchange of ratifications. (Haver v. Yaker, 9 Wall., 32.) As was said by Mr. Justice Brown in Dooley v. United States (182 U. S., 222, 230):
“ While it istrue that the treaty of peace was signed December 10, 1898, it did not take effect upon individual rights until there was an exchange of ratifications.”
*359 Under the foregoing rules, as between the high contracting parties, the title of the United States to the island of Cebu vested on the 10th day of December, 1898, the date of the treaty of Paris, but in so far as this question of title affects third parties, the title did not vest until the 11th day of April, 1899, the date of the ratification of the treaty. From the foregoing rule it would appear that technically a state of war existed between the United States and Spain until the 11th of April, 1899, in so far as that relation would affect third parties; and this notwithstanding the protocol of August 12, 1898, the only effect of which was to suspend active hostilities until a treaty was concluded. In view of this fact we do not see that it makes any difference in the decision of this case whether we consider the island of Cebu as belonging to the United States or as belonging to Spain at the time of the importation of the merchandise by the claimants. If Spanish territory, then the claimants who, though British subjects, were doing business at Manila, a port within the military jurisdiction of the United States, were trading with belligerents of the United States, which is forbidden by the rules of international law. (Wheaton's International Law, 422; Montgomery v. United States, 15 Wall., 395.)
Doubtless the military authorities of the United States could grant permission so to trade, and it seems had done so in this case. But they had granted this privilege upon the condition that the duties upon importations into the different ports of the Philippine Islands must be paid at Manila. This condition the claimants failed to comply with in the first instance, and the exaction of these duties at a later date was well within the authority of the military commander at Manila.
As to the duties and obligations of the claimants while •doing business at Manila under the American flag, it hardly needs citation of authorities to the effect that for the time being they owed allegiance to the military authorities of the United States at that place. Any lawful regulation imposed by the collector of that port was as binding upon them as though they had been native-born citizens. (Taylor's International Law, 467; Carlisle v. United States, 16 Wall., 147.)
*360 It is true that Cebu was not then in the actual “ occupation and possession ” of the United States as prescribed by the executive order of July 13, 1898, but Manila was so occupied and possessed; and trade elsewhere by American citizens or aliens doing business at Manila and under the American Hag was forbidden except upon the condition that Manila should be considered the port of entry for the payment of duties upon importations. For the purpose- of exacting this condition all of the ports of the Philippine Islands were occupied and possessed by the military authorities of the United States.
It was said by the military board at Manila, to- which this matter was referred, that the remedy of the United States on account of this infraction of trade was the confiscation of the Venus and her cargo and not the collection of duties. We do not think so. It does not appear from the findings that there was any secrecy about this transaction. This regulation as to the payment of duties at Manila was a matter of common knowledge among' those doing business there. Before the arrival of the Venus at Cebu the claimants had an interview with the military collector of customs at Manila in which the payment of duties on this importation was discussed, and at- which time the claimants themselves suggested the interruption of the Venus before its arrival at Cebu, that the collector might thereby take such steps as he thought most expedient in the interest of the government. If in connection with this fact we take into consideration the letter of claimants to the collector of customs under date of January 24, 1899 (set forth in Finding VI), the next day after this interview, in which they say that they will request their Cebu friends “ to protest against the payment of any duty in Cebu in view of the Cebu, customs being under your control,” it may well be presumed that the claimants were not willfully violating the regulations of the collector at Manila and expected to pay their duties there if required so to do.
If we take the other view of this controversy, that the island of Cebu was American territory at the time of the-importation of the merchandise, the case of the claimants is *361 certainly no better. In that-event, our possession and occupation of the Philippine Islands was no less a mere military occupation, subject to such rules and regulations as the military authorities might prescribe, one of which was the one alréady mentioned, that all duties should be paid at the port of Manila. If the claimants were willfully disobeying these regulations and were secretly trading with rebellious subjects of the country under whose flag they were doing business, they certainly have no cause for complaint when only penalized by being called upon to pay the prescribed duties. If the more lenient view is taken as above, then they were only somewhat reluctantly obeying a lawful regulation.
Much reliance is placed by the claimants upon the case of Rice v. United States (4 Wheat., 246). In that case it appeared that Castine, Me., was captured by the British forces. September 1, 1814, and remained in possession of the enemy until after the ratification of the treaty of peace February,. 1815. During that period the British Government exercised all civil and military authority at that place, including the collections of customs upon importations. Upon the reestablishment of American authority there, the. collector of customs claimed the right to collect American duties upon goods which had already paid duties to the British military government above mentioned, but this right was denied by the Supreme Court in that case. There was nothing in that case analogous to the case at bar. Although the report of the case does not show who the importer was who had paid these duties to the British authorities, he was doubtless a citizen of Castine, who for the time being was subject to such laws and regulations as the military power there might prescribe; or, perhaps, a citizen of Great Britain or .some neutral power who was carrying on a lawful trade with the inhabitants of Castine. Certainly it could not have been an American citizen, dr an alien doing business at another American port, carrying in merchandise to Castine under an American flag.
If there was any doubt about the authority of the military collector of customs at Manila to collect duties upon importations, at other ports, though in the actual possession of a temporary authority, the act of June 30, 1906 (34 Stat., 636), *362 as construed by the Supreme Court in Heinszen v. United States (206 U. S., 370), ratified this collection. In that case Mr. Justice White, speaking for the court, said:
“ That where an agent, without precedent authority, has exercised in the name of a principal power which the principal had the capacity to bestow, the principal may ratify and affirm the unauthorized act, and thus retroactively give it validity when rights of third persons have not intervened, is so elementary as to need but statement.” (Id., 382.)
There can be no doubt of the authority of this Government at that time to prescribe such conditions as it saw fit upon trade under its own flag with the different .ports in the Philippine Islands. Its agent prescribed the conditions mentioned under which the duties in question were paid, and if we admit, as we do not, that he exceeded his authority in so doing, they were subsequently ratified and affirmed.
Judgment will be entered dismissing the petition.
Howry, J., was not present at the trial, of this case and took no part in its decision.