ALFRED J. KEPPELMANN et al., trustees, &c.,

*v.*

ERICH P. KEPPELMANN et al.

[Decided September 26th, 1918.]

1. In order to protect themselves as well as creditors of the estate, executors must require refunding bonds before paying shares to distributees.

2. Under Trading with the Enemy act, and executive order of February 26th, 1918, the alien property custodian's authority is over the property of and interests of alien enemies in property, and not in property in which they have an interest, so that custodian's interest in the right of alien enemies to legacies is to receive such shares from the trustees upon giving the refunding bonds required of beneficiaries to protect creditors and executors, since they are not protected by section 7, subdivisions c, e.

3. The authority of the president as commander-in-chief of the army cannot be extended by congressional action or otherwise over the civil population without the field of military operation to the taking of private property for public use without just compensation.

4. The congressional assumption, as shown by Trading with the Enemy act, section 17, providing that federal courts may make orders and decrees necessary to enforce the act, is that the courts should determine what is or what is not enemy property.

5. Powers of attorney for collection of money, executed prior to the existence of a state of war, rendering principals enemy aliens, may continue to be valid, notwithstanding the state of war, and notwithstanding the Trading with the Enemy act, and may be exercised without violating the rules of public policy.

6. Where it is obviously against the interests of the principal that the agency should continue, or where its continuance would impose some new obligation or burden, the assent of the principal to the continuance of the power after the war broke out will not be presumed, but must be proved, either by his subsequent ratification or in some other manner.

7. It is plainly against the interest of alien principals that their attorneys in fact give refunding bonds to executors of an estate and receive their legacies and turn the same over to the alien property custodian, so it will not be presumed that such principals desire the agency of their attorneys in fact to continue.

8. That alien enemies have been made parties to a suit and served by publication and mailing under license of war trade board, and have interposed no defence by counsel as authorized by the Trading with Enemy act, is insufficient to constitute an election to continue powers of attorney to citizens to receive their legacies.

9. It being to the interest of enemy alien principals that their attorneys in fact represent them in proceedings to determine accounting and distribution of their shares in an estate, consent to continuance of a pre-war power of attorney therefor will be presumed.

10. Where legacies payable to alien enemy beneficiaries cannot be paid over to the alien property custodian, but must be held by executors as trustees awaiting disposition, the court may direct their investment in securities approved by such custodian.

On bill, &c.

*Mr. Edward M. Colie* and *Mr. Runyon Colie,* for the executors and trustees.

*Mr. Martin V. Bergen* and *Mr. Ruby R. Vale* (of the Philadelphia bar), for Schulz & Ruckgaber, holders of the powers of attorney.

*Mr. Charles L. Carrick* and *Mr. Mansfield Ferry,* for the alien property custodian.

LANE, V. C.

Testator, after disposing of a portion of his estate, gave all the rest and residue to his executors in trust. The trustees were directed to divide the estate into parts. Upon making the division, the trustees were directed to pay over certain shares to those who are now alien enemies. The duty of the trustees with respect to the shares of the alien enemies is merely to pay over. The executors are prepared to make the payments. They were authorized to pay over in kind, and propose to do so. The shares are demanded by Schulz & Ruckgaber, citizens of this country, resident here, by virtue of powers of attorney executed by the alien enemy beneficiaries prior to the war (which powers of attorney give the holders full power to represent the alien enemy principals, to receive the shares and to execute and deliver proper refunding bonds), and by A. Mitchell Palmer, alien property custodian, by virtue of authority conferred upon him by the act "An act to define, regulate and punish trading with the enemy, and for other purposes," October 6th, 1917, and by proclamations and orders made by the President in pursuance of such act. He states that he has no authority to execute refunding bonds, and, in any event, he declines to give them. I will say here that I will not pass upon the question as to whether in fact the alien property custodian can execute and deliver refunding bonds because of the attitude which he has taken, that, under no circumstances, will he give them. Schulz & Ruckgaber have the authority (if the powers of attorney be valid and exercisable) and are prepared to execute and deliver the refunding bonds. They admit that if the shares are turned over to them they hold them subject to the direction of the alien property custodian and must account to him for them.

May the shares be turned over either to Schulz & Ruckgaber or the alien property custodian without the execution and delivery of refunding bonds?

By section 78 of the Orphans Court act (*3 Comp. Stat. p. 3837*), as amended by the laws of 1912, chapter 180, every executor or administrator, on the payment of any legacy or distributive share to the person entitled to the same, is directed to take a re-

funding bond. The bond is for the benefit of any creditor who may sue thereon to recover the proportionate burden which the moneys paid to the distributee ought to bear to pay the debt, notwithstanding that the creditor may have been barred by a decree of limitation. If the share is paid, in the first instance, to a trustee, the executors are required to take from the trustee a refunding bond. The purpose of the amendment of 1912 was to permit a trustee, to whom an initial payment had been made by the original executor, to escape responsibility upon a refunding bond given by him by taking from the ultimate distributee a refunding bond running to the original executor. So, in the instant case, before the executors could turn over to themselves as trustees, they must have given to themselves as executors refunding bonds executed by them as trustees. If they did not do so, they are liable as executors. To escape this responsibility, the statute permits them to take refunding bonds executed by the ultimate distributees to themselves as executors. It seems to me to be clear that the executors must exact, in order to protect themselves, refunding bonds, before the shares can be paid over.

The alien property custodian insists that the statute is inapplicable as to him. He takes the position that the Trading with the Enemy act is a war measure; that the president acts under it as commander-in-chief of the army; that the president's determination that property is enemy property is final and conclusive, and that any property in which the president has determined that there is an enemy interest must be forthwith paid over to the alien property custodian; that the executors, in the instant case, are required to pay over the shares to him without exacting refunding bonds. Without assuming to intimate an opinion as to the constitutionality of any legislation which would bear the construction contended for by the alien property custodian, I think a consideration of the act, and the proclamations and orders issued under it, will demonstrate that no such construction is possible. The act does not purport to require the turning over of property in which there is an enemy interest. Section 7c provides

"that any money or other property owing or belonging to or held for, by, on account of, or on behalf of, or for the benefit of an enemy or ally of enemy not holding a license granted by the president hereunder, which the president after investigation shall determine is so owing or so belongs or is so held, shall be conveyed, transferred, assigned, delivered or paid over to the alien property custodian."

The executive order of February 26th, 1918, provides, *inter alia*:

"Sec. 2 (*a*) A demand for the conveyance, transfer, assignment, delivery and payment of the money or other property, unless expressly qualified or limited, shall be deemed to include every right, title, interest and estate of the enemy in and to the money or other property demanded, as well as every power and authority of the enemy thereover."

The act deals with property of alien enemies and the interest of alien enemies *in* property, *not* with property *in which* alien enemies have an interest and the authority of the alien property custodian is over the property of, and interests of alien enemies *in* property, not in property *in which* alien enemies have an interest. In the case at bar, the right of the alien enemies in the shares in question is to receive those shares from the trustees upon the performance by them of a condition, to wit, the giving of refunding bonds. The alien enemies have beneficial but not legal rights in the shares. To those beneficial interests the alien property custodian succeeds, but he cannot convert the beneficial interest into legal estates and reduce the shares to his possession until the conditions, which the alien enemies must have performed, are performed, and until the trustees and the creditors of the estate are fully protected. The provisions of section 7, subdivision *e* of the Trading with the Enemy act, does not protect the trustees or the creditors of the estate. The right of the trustees is not *in* the property so that upon turning over the property they may resort to the remedies provided for in section 9. It is a right to have created a personal liability of the distributees upon which creditors may sue. No acquittance or discharge by the alien property custodian could acquit or discharge them of their duty toward creditors. Its uttermost effect would be to acquit and discharge as against those who had rights in the property itself. Assuming that the acquittance of the alien property

custodian would operate to release the executors from all liability so that suit might not be brought against them by creditors of the estate, then the rights of creditors of the estate would be taken away, without compensation, and no substitute would be provided. I had always supposed that the constitutional interdiction against the taking of private property for public purposes without compensation or the providing of a method of compensation, is as effective in time of war as in time of peace and that the government may not take private property for war purposes without compensation, or without providing a means by which compensation may be made as in cases of eminent domain. In considering the English practice it is wise to keep in mind that the power of the English parliament is unlimited, whereas that of the American congress is circumscribed by a written constitution. I had never supposed that the authority of the president as commander-in-chief of the army "to commandeer" (if by that term is meant the taking of property without first having made compensation or providing a method of compensation) extended or could be extended by congressional action or otherwise over the civilian population without the field of military operation.

I express no opinion, because not necessary, as to the power of congress to deprive citizens of the United States of their ordinary legal remedies against alien property or with respect to their interests in alien property, or whether the provisions of section 9 give such an adequate remedy as to constitute due process of law. Whether certain property is or is not enemy property and the determination of rights and interests in property is usually a question to be determined by judicial authority; whether congress can, because of a state of war, confer upon the president authority to determine, as against the rights of citizens of this country, what is and what is not enemy property without the declaration of martial law, is a question upon which no opinion ought to be expressed until the point is squarely raised.

There is a very clear distinction between the power to determine what is or is not an essential war industry and what is or is not enemy property. That congress assumed that it would be necessary to invoke the aid of the courts in reaching enemy prop-

erty, and that the determination of the question as to what is or is not alien property may be a matter to be settled by the judicial tribunals is, I think, indicated by the provisions of section 17 of the act by which full power and authority is given to the federal courts to make such orders or decrees as may be necessary to enforce the provisions of the act.

A different question would arise if the United States were the ultimate distributee, which would be the case if the government, as it might have (treaty rights not being considered) had confiscated the property of alien enemies. Whether or not refunding bonds, in such instance, would be required, is a question upon which I express no opinion. The government, however, has not confiscated the property. It has provided for the appointment of a custodian (making him a common law trustee) expressly reserving to itself the right to determine, at some future time, what shall ultimately be done with the property taken into his possession. It may be turned back to the alien enemies, in which event we would have a situation where the alien enemies would have received their distributive shares and, because of the existence of the war, have been absolved of the necessity of giving the refunding bonds required by our statute to protect creditors.

My construction of the provisions of the statute, and the orders of the president applicable to the facts in the case at bar, leads me to the conclusion that neither Congress or the President intended to confer upon the alien enemy custodian any higher power over the shares held by the trustees than the alien enemies themselves would have if a state of war did not exist.

I am of the opinion that the shares cannot be turned over to the alien property custodian without the execution and delivery of refunding bonds.

Are the powers held by the attorneys in fact valid and exercisable?

I think it must be considered as settled by judicial dicta that under the common law powers of attorney for the collection of moneys executed prior to the existence of a state of war continue to be valid, notwithstanding the state of war and that they may be exercised. *United States* v. *Grossmayer, 9 Wall. 72; 19 L.*

*Ed. 627; Montgomery* v. *United States, 15 Wall. 395; 21 L. Ed. 97; New York Life Insurance Co.* v. *Davis, 95 U. S. 425; 24 L. Ed. 453; Williams* v. *Paine, 169 U. S. 55; 42 L. Ed. 659.*

If there is anything inconsistent to be gathered from any language used in *Mutual Benefit Life Insurance Co.* v. *Hillyard, 37 N. J. Law 444,* it must be considered to have been overruled by the later federal cases. The English court of appeals in chancery has held, in the case of *Tingley* v. *Muller* (*1917*), *2 Ch. 144,* that a power executed before the war authorizing an agent to sell lands remained valid and might be exercised after the outbreak of the war, although the principal became an alien enemy. In that case the power was made irrevocable for a period of twelve months. It would seem clear, from a consideration of the cases above referred to, that there is no rule of public policy which is offended by recognizing the validity of such powers and the right of the attorneys in fact to act under them.

Are the powers rendered invalid by our Trading with the Enemy act? The supreme court of the United States, in the cases above referred to, has held that, notwithstanding the broad language of the Non-intercourse act in effect during the Civil war, powers authorizing the performance of acts of greater extent than authorized by those under discussion might properly be exercised during war. The Trading with the Enemy act forbids, section 3,

"any person * * * to trade, or attempt to trade, either directly or indirectly, with, to or from, or for, or on account of, or on behalf of. or for the benefit of any other person, with knowledge or reasonable cause to believe that such other person is an enemy, or ally of enemy, or is conducting or taking part in such trade * * *."

The words "to trade" are defined in the act, among other things, to include: "*a.* Pay, satisfy, compromise or give security for the payment or satisfaction of any debt or obligation." "*d.* Buy or sell, loan or extend credit, trade in, deal with, exchange, transmit, transfer, assign or otherwise dispose of, or receive any form of property." Notwithstanding that the word "trade" has been defined to include the payment of a debt and the receipt of property, before the performance of the act becomes illegal, it must be on behalf of or for the benefit of the

alien enemy. The case in the English court of appeals, chancery division, therefore becomes a direct authority. That court held, four judges to one, that a payment to the holder of a power of a consideration and the conveyance of real property by the holder of a power in pursuance thereof, was not within the language of their Trading with the Enemy act and royal proclamations, forbidding the payment of money to or for the benefit of an enemy. It may be argued with great force that our Trading with the Enemy act was not intended to be any broader than the English act.

For reasons hereafter noted it will be unnecessary for me at this time to determine whether, without a license from the president, the holders of the powers may receive the shares in question. It will be observed that, in the one case in the supreme court of the United States (*Williams* v. *Paine*) in which powers (similar or broader than those at bar) have been held valid, the question arose after the war and the facts showed ratification by the principal or acts which resulted in an estoppel. The court stated the rule, Mr. Justice Peckham (at *p. 73*) : "Where it is obviously and plainly against the interests of the principal that the agency should continue, or where its continuance would impose some new obligation or burden, the assent of the principal to the continuance of the agency after the war broke out will not be presumed, but must be proved, either by his subsequent ratification or in some other manner. And, on the other hand, where it is the manifest interest of the principal that the agency constituted before the war should continue, the assent of the principal will be presumed. Or, if the agent continues to act as such, and his so acting is subsequently ratified by the principal, then the acts are just as valid and binding on the principal as if no war had intervened." In a case determined during the pendency of war, where intercourse with the principal is forbidden, the court must go to the length of holding that the presumption referred to by the supreme court is irrebuttable. It may be that the court would go to that length, or rather would hold that, where it appears that the exercise of the power would be for the benefit of the alien enemy in a time of peace, he is estopped from

asserting a revocation of the power because of an irrebuttable presumption that, if he revokes, it is because of the war and for the purpose of doing a detriment to this country which will not be tolerated where property rights in this country are the means employed to do the detriment.

But it seems to me that it is plainly against the interests of the principals that the agency in the instant case, so far as giving refunding bonds is concerned, should continue. Its exercise would impose a new obligation or burden upon the principals. The exercise of the power requires the giving of refunding bonds. These bonds are personal obligations of the principals which may be sued upon in any jurisdiction. In return for the giving of these refunding bonds, for which in time of peace the principals would receive shares, they now get nothing. The shares go to the alien property custodian, and what will finally be done with them is a matter for congress to determine. Many contingencies may arise which would cause the alien enemies to elect, rather than to give the refunding bonds, to disclaim any interest in the shares.

I cannot, therefore, presume that the principals desire that the agency, so far as the power to give refunding bonds is concerned, should continue.

It is no answer to say that the alien enemies have been made parties to this suit and have been served by publication and by mailing under a license of the war trade board and that they have interposed no defence to this action. Neither the bill nor the notice of publication sent to the enemy aliens set forth the situation in sufficient detail to call upon them to express an election as to whether the powers should continue to be exercisable or not.

Nor is it certain that if the alien enemies had desired to express an election they would have been able to communicate their election owing to the exigency of war.

Under the Trading with the Enemy act, it is expressly provided, section 7, subdivision *b*, that an alien enemy may defend by counsel any suit in equity or action at law which may be brought against him.

Steps should be at once taken by the holders of the power to ascertain the desire of the alien enemies as to whether or not the holders of the powers of attorney should execute refunding bonds on their behalf.

The foregoing disposes of the case at the present time. If it appears that the alien enemies desire that the powers of attorney should be executed, it will remain to be determined whether, assuming that the receipt of the shares by the holders of the powers is not forbidden by the Trading with the Enemy act (which is not decided), the court will, in disregard of the desire of the alien property custodian, direct the shares to be paid over to the holders of the powers. In this connection it must be kept in mind that the holders of the powers take the shares for the immediate benefit of the alien property custodian. He is entitled to them immediately upon receipt of them by the holders of the power. Ordinarily, the court would not, against the express desire of the principal, direct property to be transmitted to an agent. There may be exceptions to this rule. If it appeared that, for the protection of the trustees, it was necessary that they should get rid of these shares and the responsibility for them, and that the person who was entitled to their immediate custody could not receive them directly, as I have already held he cannot, but might receive them through the intermediary of an agent, and that he refused to permit that agent to act, an interesting situation would arise.

My conclusion is that the shares cannot be paid over to the alien property custodian, nor at the present time to the holders of the powers, and I will advise a decree that the shares be held until there is a change in the situation. I will permit testimony to be taken to show the present desire of the alien enemies as to the present exercise of the powers.

So far as the powers authorize the holders to appear for the principals and represent the principals in the pending proceedings, they are valid and exercisable. It is clearly to the interests of the alien enemies that they be represented at the passing of these accounts and the distribution of the estate. The alien enemies are, therefore, in this cause, not only by virtue of being

brought in by publication, but by virtue of their representation by their attorneys in fact so far as to bind them as to proceedings on the accounting and distribution, as well as by their representation by the alien property custodian. The intimation by the representative of the alien property custodian (Mr. Ferry) that the holders of the powers by making demand for the property and appearing in court have subjected themselves to the penalties provided for by the act is, I think, wholly without merit.

The English court of appeals in chancery, in *Tingley* v. *Muller, supra,* indicated that a proper way out of the difficulty, if a difficulty existed in that case, would be for the body equivalent to our war trade board to issue a license to the holders of the powers under which they might receive the moneys and upon receipt transmit them to the alien property custodian. A similar course may be pursued in this case and all difficulty will disappear.

### SUPPLEMENTAL OPINION.

It is suggested in the brief of counsel for the alien property custodian that one of the purposes of the Trading with the Enemy act, and the appointment of the alien property custodian, was to create a fund which might be used for the benefit of the United States, and that the effect of a decision, such as I have rendered, would be to defeat that purpose. In the instant case there can be no difficulty with respect to this. The trustees may be directed to convert the shares and invest the proceeds in such securities as under the act the alien property custodian has power to direct their investment in. In other words, the trustees may be directed to do with the shares whatever the alien property custodian can legally do with them. Whatever moneys have been paid into court have been directed by the order of the court to be invested in liberty bonds.