## WALKER'S EXECUTORS *v.* UNITED STATES.

On the 12th of April, 1865, A., a resident of Memphis, purchased, in Mobile, from B., a resident of that city, — both cities being then in the occupancy of the national forces, — cotton, which was then in the military lines of the insurgent forces, in Alabama and Mississippi, the inhabitants whereof had been declared to be in insurrection. Between June 30 and December 1 of that year a portion of the cotton — while it was in the hands of the planters from whom it had been originally purchased by the Confederate government, the agent of which had sold it, in Mobile, to B. on the 5th of April — was seized by treasury agents of the United States and sold. The proceeds were paid into the treasury, and A. sued to recover them. *Held,* that his purchase being in violation of law, no right arose therefrom which can be enforced against the United States.

APPEAL from the Court of Claims.

In this action, brought under the act of March 12, 1863, c. 120, commonly known as the Captured and Abandoned Property Act, the appellants seek to recover from the United States the net proceeds (alleged to be at least $600,000) of certain cotton, seized and sold by the agents of the Treasury Department in the year 1865. The petition having been dismissed by the Court of Claims, this appeal was taken.

The facts as found by that court are substantially these: Prior to the year 1865, John Scott, the chief agent for produce-loan for the Confederate government in Alabama and East Mississippi, purchased there at different times, and of different planters 3,405 bales of cotton, taking from the planter, on each purchase, a receipt and agreement in the following form : —

" STATE OF MISSISSIPPI,
   " *County of*        *, town or post-office*
                                   " NOVEMBER 27, 1862.

"The undersigned, having sold to the Confederate States of America, and received the value of the same in bonds, the receipt whereof is hereby acknowledged, one hundred and thirty-five bales of cotton, marked, numbered, and classed as in the margin, which is now deposited at        plantation, hereby agrees to take due care of said cotton whilst on his plantation, and to deliver the same, at his own expense, at        , in the State of Mississippi, to the order of the secretary of the treasury, or his agents or their assigns."

In each instance he delivered to the planter a certificate in the following form : —

                              " ABERDEEN, Nov. 27, 1862.

" The undersigned, as agent of the government, certifies that the within cotton has been examined by him or by a competent judge, and that its character will rank, according to the commercial scale, as middling; and also, that the weights and marks are as described — the cotton being in good merchantable order, marked with the name of the planter, and on one end the initials C. S. A., and safely stored in a covered building.

" The undersigned certifies that the price agreed upon is a fair market price at the present time.

                                              " *Ag't.*"

There were thirty-seven such certificates, upon which appeared the number, weight, and marks of the bales purchased.

The Confederate government, being in need of large sums of money for its military department, and in order to pay debts incurred and to be incurred, authorized and directed Scott to sell this cotton, and all other cotton purchased by him in like manner. Accordingly, on the 6th of April, 1865, at Mobile, Ala., the place of his residence and business, he,

as such Confederate produce-loan agent, sold to one O'Grady, a citizen and resident of the same place, the 3,405 bales of cotton, at the price of one dollar per pound in Confederate States currency, transferring to him the planter's receipts, as above described, and attaching to each a certificate in the following form : —

" CONFEDERATE STATES OF AMERICA,
" TREASURY DEPARTMENT, April 6, 1865.

"·This is to certify that the within and above-described cotton has been sold to D. O'Grady,      bales, and delivery is hereby ordered to be made to him, or his order, with license to export the same from the Confederate States to any neutral port, on complying with the requisitions of the law.

" Given under my hand and the seal of the Treasury Department, on the year and day above mentioned.

" JOHN SCOTT,
" *Chief Ag't Produce Loan for Ala. and East Miss.*
" P'r J. G. ULRICK, *Ag't.*"

On the 6th of March, 1865, President Lincoln gave to Samuel P. Walker (whose executors are claimants in this case) an order, of which the following is a copy : —

" EXECUTIVE MANSION, March 6, 1865.

" Whereas Samuel P. Walker, of Memphis, Tenn., claims to own products of the insurrectionary States near Grenada and Canton, Miss., and Montgomery and Selma, Alabama, and has arrangements with parties in the same vicinities for other products of the insurrectionary States, all which he proposes to sell and deliver to agents authorized to purchase for the United States the products of the insurrectionary States, under the act of Congress of July 2, 1864, and the regulations of the Secretary of the Treasury, it is ordered that all such products which a purchasing agent of the government has agreed to purchase, and the said Walker has stipulated to deliver, as shown by the certificate of the purchasing agent, authorized by Regulations VIII., Form No. 1, appended to regulations attached hereto by such agent, and being transported, or in store awaiting transportation, for fulfilment of stipulations and in pursuance of the regulations of the Secret ry of the Treasury, shall be free from seizure, detention, or forfeiture to the United States; and officers of the army and navy and civil officers of the government

will observe this order, and will give to the said Walker and his agents, means of transportation, and to said products, free and unmolested passage through the lines (other than blockade lines), and safe conduct within the lines while going for or returning with said products, or while said products are in store awaiting transportation for the purposes aforesaid.

"ABRAHAM LINCOLN."

On the 12th of April, 1865, the city of Mobile, which had been continuously invested from 1862, was captured by the Union forces. On that day, at Mobile, Walker, who was a resident and citizen of Memphis, Tenn., purchased from O'Grady the 3,405 bales of cotton referred to (and which was still in the hands of the planters under their arrangement with Scott), taking from him a bill of sale, which was attached to a list specifying the number of bales, weight, and the names of the counties where the cotton was originally purchased from planters. The bill of sale was as follows: —

" For value received of Sam'l P. Walker, I hereby transfer, sell, and assign the above lots of cotton, amounting to 3,405 bales, without recourse upon me, and the holders thereof will please deliver the same to the said Walker or his authorized agent.

" April 12, 1865.                    D. O'GRADY."

At the same time O'Grady delivered and indorsed to Walker the planters'. certificates, which the former had received from Scott. The cotton remained on the plantations, and the only delivery to Scott, O'Grady, or Walker was by the planters' certificates, and their transfer by indorsement, as hereinbefore stated.

On the 5th of May, 1865, by the surrender of General Taylor, commanding the Confederate forces in Alabama and Mississippi, the counties in which this cotton was held passed under the military control of Gen. E. R. S. Canby, commanding the Union forces at Mobile. The United States military authorities seized all the lines of railroads and steamboats in that section, and on May 10, 1865, the following order was issued by General Canby: —

"HEADQUARTERS ARMY AND DIVISION OF WEST MISSISSIPPI,
 "MOBILE, ALABAMA, May 10, 1865.
"(General Field Orders, No. 39.)

"The cotton belonging to the Confederate government in East Louisiana, Mississippi, Alabama, and West Florida having been surrendered to the government of the United States, its sale to private individuals, or its transfer to any persons except the officers or agent of that government, is prohibited. This order applies to all cotton procured by subscriptions to the cotton loan, by the sale of Confederate bonds or notes, by the tax in kind, or by any other process by which the title was vested in the Confederate government, whether in the possession of the agents of that government or still in the hands of the producers; and all persons in whose charge it may be will be held accountable for its delivery to the agents of the United States. Commanders of districts will be furnished with a transcript from the records of the cotton agents showing the quantity and location of the cotton within the limits of their commands, and will give the agents of the Treasury Department, appointed to receive it, such facilities as may be necessary to enable them to secure it.

"Any sale of this property in violation of this order will be treated as the embezzlement of public property.

"By order of Major-General E. R. S. Canby."

On the 1st of June, 1865, F. W. Kellogg, agent of the United States for the purchase of cotton in insurrectionary States, entered into an agreement with Walker, of which the following is a copy : —

"MOBILE, ALABAMA, June 1, 1865.

"I, Francis W. Kellogg, agent for the purchase of cotton of insurrectionary States, on behalf of the government of the United States, at Mobile, Alabama, do hereby certify that I have agreed to purchase from Samuel P. Walker, Esq., of Memphis, Tennessee, thirty-five hundred bales of cotton, which, it is represented, are or will be stored at Green, Pickens, & Marengo Co.'s, in the State of Alabama, and with planters in the counties of Lauderdale, Noxubee, Lowndes, and Monroe, in the State of Mississippi, and which he stipulates shall be delivered to me, unless prevented from so doing by the authority of the United States.

"I therefore request safe conduct for the said Samuel P. Walker and his means of transportation, and said cotton from where it is

stored to Mobile, where the cotton so transported is to be sold and delivered to me, under the stipulation referred to above, and pursuant to regulations prescribed by the Secretary of the Treasury.

"F. W. KELLOGG,
*" United States Purchasing Agent.*

"NOTICE.— Cotton arriving at Mobile under this permit must be promptly reported to the United States purchasing agent."

Between June 30 and Dec. 1, 1865, 1,922¾ bales of this cotton (on plantations in Lowndes and other counties in Mississippi) were, by treasury agents appointed by the Secretary of the Treasury to collect cotton which had been sold to the Confederate States, seized and sent to New York. They were sold there, and the net proceeds covered into the treasury of the United States.

The territory embracing the counties in Mississippi where the cotton was stored, and where it was when seized by the treasury agents, was occupied by the Confederates on and prior to April 12, 1865, while Mobile and Memphis, at that date, and until the close of the war, were occupied by the Union forces.

The negotiations for the sale of this cotton to O'Grady took place in the early part of the year 1865. The final conveyance was delayed until April 6, 1865, and finally completed on that day, by reason of the ill-health of Scott, and for other reasons.

In making sales of cotton in that section of the country, during Confederate control, the custom was to transfer the planters' certificates, as if negotiable. That was the usual, and generally the only, mode of delivery made or required.

The Court of Claims found, as conclusions of law, that the order of President Lincoln of March 6, 1865, was not a license or permit which authorized Walker to purchase the cotton in question in Mobile at the time and under the circumstances set forth in the findings ; that Walker acquired no title as against the United States by his alleged purchase from O'Grady ; and that the claimants consequently had no cause of action against the government.

*Mr. Warner M. Bateman*, with whom were *Mr. Quinton Corwine* and *Mr. John Pool*, for the appellants.

*The Solicitor-General* for the United States.

MR. JUSTICE HARLAN, after stating the case, delivered the opinion of the court.

By the proclamation of the President of the United States, issued, on the sixteenth day of August, 1861, in pursuance of authority given by the act of July 13, 1861, c. 3, the inhabitants of Tennessee, Alabama, Mississippi, and other States, — except that part of Virginia west of the Alleghany Mountains, and of such other parts of that and the other States named as might maintain a loyal adhesion to the Union, or might, from time to time, be occupied and controlled by the Union forces, — were declared to be in a state of insurrection against the United States; and "all commercial intercourse between the same and the inhabitants thereof, with the exceptions aforesaid, and the citizens of other States and other parts of the United States," was made unlawful until the insurrection ceased or was suppressed.  The fifth section of the act provides that " The President may, in his discretion, license and permit commercial intercourse with any such part of said State or section, the inhabitants of which are so declared in a state of insurrection, in such articles, and for such time, and by such persons, as he, in his discretion, may think most conducive to the public interest; and such intercourse, so far as by him licensed, shall be conducted and carried on only in pursuance of rules and regulations prescribed by the Secretary of the Treasury."

By the proclamation of April 2, 1863, the territorial exceptions made in the former proclamation were revoked, except as to West Virginia and the ports of New Orleans, Key West, Port Royal, and Beaufort.

By the fourth section of the act of July 2, 1864, c. 225, the prohibitions and provisions of the said act of July 13, 1861, and of the acts amendatory thereof or supplementary thereto, were made to apply " to all commercial intercourse by and between persons residing or being within districts within the present or future lines of national military occupation, in the States or parts of States declared in insurrection, whether with

each other or with persons residing or being within districts declared in insurrection and not within those lines."

The eighth section of the same act makes it lawful for the Secretary of the Treasury, with the approval of the President, to authorize agents to purchase for the United States any products of States declared in insurrection, at such places as shall be designated by him. And the ninth section provides : —

" That so much of section five of the act of thirteenth of July, eighteen hundred and sixty-one, aforesaid, as authorizes the President, in his discretion, to license or permit commercial relations in any State or section, the inhabitants of which are declared in a state of insurrection, is hereby repealed, except so far as may be necessary to authorize supplying the necessities of loyal persons residing in insurrectionary States within the lines of actual occupation by the military forces of the United States, as indicated by published order of the commanding general of the department or district so occupied; and, also, except so far as may be necessary to authorize persons residing within such lines to bring or send to market in the loyal States any products which they shall have produced with their own labor or the labor of freedmen or others employed and paid by them, pursuant to rules relating thereto, which may be established under proper authority. And no goods, wares, or merchandise shall be taken into a State declared in insurrection, or transported therein, except to and from such places, and to such monthly amounts, as shall have been previously agreed upon in writing by the commanding general of the department in which such places are situated, and an officer designated by the Secretary of the Treasury for that purpose."

From these acts, — in force on the 12th of April, 1865, when Walker purchased from O'Grady, — it is quite clear that persons residing or being in Memphis, then occupied by the national forces, were forbidden, unless authorized by competent authority, to have commercial intercourse with persons residing or being in Mobile, which was at that time likewise occupied by the national forces ; this, because both cities were within States the inhabitants whereof were declared to be in insurrection, and neither within the territorial exceptions made in the proclamation of President Lincoln.

But it is contended that the order of President Lincoln, given on the 6th of March, 1865, fully authorized Walker to proceed from Memphis, his place of residence, to Mobile, after that city had surrendered to the Union forces, and there contract with O'Grady for the purchase of the cotton in question, then but recently the property of the Confederate States (at least as between them and the original owners), and within the district actually occupied and controlled by the insurgent forces. A portion of the argument of counsel is addressed to the question whether, notwithstanding the repeal of the fifth section of the said act of July 13, 1861, authorizing the President, in his discretion, to license or permit commercial relations in any State or section in insurrection, he could not, in virtue of his power as commander-in-chief of the army, license trade with insurgents within the lines of Confederate military occupancy. If this question has not been distinctly concluded by the former decisions of this court, we deem it unnecessary now to consider or determine it. For, plainly, the order of March 6, 1865, was not a license to trade or have commercial intercourse with the enemy, without limit as to amount, or without restriction as to persons and territory. The order proceeds solely upon the ground that Walker *then* owned products of the insurrectionary States, near Grenada and Canton in Mississippi, and Montgomery and Selma in Alabama, and that he *then* had arrangements with parties in the vicinity of those places for other products of the insurrectionary States. It was in reference to *such* products — those he then owned, and those as to which he then had arrangements with other parties — that the President ordered that they should be free from seizure, detention, or forfeiture to the United States. Now, the finding of the facts, upon which alone this court can act, shows that Walker did not, on the 6th of March, 1865, own any part of the cotton in question. It was then in the possession of the planters, who held it for the Confederate government; and if it ever was, as against the United States, — after its sale to the Confederate government, to be used in aid of the rebellion, — the property of O'Grady, from whom Walker purchased, it did not become so until April 5, 1865. Nor does it appear that this cotton constituted, at any time, a part of the cotton with reference to which Walker had

" arrangements " at the time President Lincoln gave the order of March 6, 1865. It is true that the court below finds that " the negotiations for the sale of the cotton to O'Grady took place in the early part of the year 1865, and the final conveyance delayed until April 6, 1865, and finally completed on that day, by reason of the ill-health of Scott (the Confederate produce-loan agent), and for other reasons." But the negotiations here referred to were, manifestly, not the arrangements which Walker claimed to have had, on March 6, 1865, for products of the insurrectionary districts. There is nothing to show that he ever had any communication upon the subject of this cotton with the Confederate produce-loan agent, or with O'Grady, until after the capture of Mobile. The negotiations, which were not completed until April 6, 1865, by reason of Scott's ill-health, and " for other reasons," were evidently those by which Scott proposed to sell *to* O'Grady, and with which Walker, it must be assumed, had no connection whatever. The case, as it stands, seems to be one in which the claimants seek to bring within the operation of the order of March 6, 1865, a transaction in cotton not covered, nor intended to be covered, by it. The contract, upon the finding of facts, must be regarded as one made between Walker and O'Grady, in palpable violation of the laws of the United States forbidding commercial intercourse between persons respectively residing in places occupied by the national forces, within districts the inhabitants whereof were declared to be in insurrection. It is, therefore, according to the settled doctrines of this court, a contract from which could arise, in favor of Walker, no right to the cotton, as against the United States, which could be enforced in the courts of the Union.

Without, therefore, giving other reasons, quite apparent upon the record, and which would make it our duty to sustain the judgment of the Court of Claims, we content ourselves with affirming it upon the grounds indicated.

*Judgment affirmed.*