## Neel's Executor, et al. v. Noland's Heirs.

(Decided October 28, 1915.)

### Appeal from Shelby Circuit Court.

1. Trusts—Resulting Trusts.—Section 2353 of the Kentucky Statutes abolishes the equitable doctrine of resulting trusts, except in two cases; (1) where the title is taken in the name of the nominal purchaser without the consent of the real purchaser; and (2) where the grantee, in violation of some trust, buys land with the money or property of another.

2. Trusts—Resulting Trusts.—In order to establish a resulting trust by parol evidence, as against the holder of the legal title to property, the proof of all the essential facts and circumstances must, as a general rule, be clear, full, convincing, and satisfactory, and of such a character as to disclose the exact rights and relations of the parties, and take the matter out of the realm of conjecture or presumption, especially after a long lapse of time; and, where the evidence is uncertain, conflicting, doubtful, or unsatisfactory, or is capable of reasonable explanation on a theory other than the existence of a resulting trust, no trust will be held to be established.

3. Trusts—Resulting Trusts—Husband and Wife.—Where a husband received the money of his wife and invested it in land, prior to the Married Woman's Property Act of 1894, taking the title to his wife for life, with remainder to their issue, and upon failure of such issue to the husband's heirs, he thereby reduced his wife's general estate into his possession, and no resulting trust resulted to her with respect to the land so purchased.

4. War—Captured Property.—Private property on land not being used in aid of a war, is not subject to confiscation by the rules of international law. Private property may be seized, however, when needed in the course of military operations; but, upon the conclusion of peace, it should be restored or compensation made.

5. War—Confiscation of Enemy Property.—A belligerent nation may, by a valid municipal law, authorize the confiscation of property of the enemy.

6. War—Title to Captured Property.—Under the Abandoned and Captured Property Act of Congress, approved March 12th, 1863 (12 Stat. at L., 1266), the title to any property, except that used in actual hostilities, could not be divested in the insurgent states, unless in pursuance of a judgment rendered after due legal proceedings. By that act the federal government constituted itself the trustee for those who were entitled to the proceeds of abandoned and captured property, with the exception above stated.

7. Life Estates—Improvements.—A life tenant is not bound to make any permanent improvements on the estate; and, if he should make them, it will be presumed they were made for his own benefit, and he will not be permitted to recover anything therefor from the remainderman, or the reversioner.

8. Life Estates—Sale for Reinvestment.—Where a life tenant, having power to sell all or part of the land so held, was required by the deed under which she held to reinvest the proceeds, sold a right-of-way to a railway company and used the proceeds in building a barn and other permanent improvements upon the land, the requirement as to reinvestment was thereby satisfied, and the remainderman cannot recover from the executor of the life tenant the money she had received for the right-of-way.

O'REAR & WILLIAMS for appellants.

HUDSON & McKAY, of Vicksburg, Miss., and WILLIS, TODD & BOND for appellees.

OPINION OF THE COURT BY CHIEF JUSTICE MILLER— Affirming.

In this action the appellants, who are the executors and devisees of Bettie Neel (formerly Mary Elizabeth Noland), are seeking to establish a resulting trust, in their favor, to a farm of 200 acres, in Shelby County. The facts upon which the claim is based are wide in range and nebulous in character. Substantially, they are as follows:

In May, 1858, Pearce Noland, a prosperous young planter, living near Vicksburg, in Warren County, Mississippi, married Mary E. McGaughey, of Shelby County, Ky. They immediately went to live upon his Mississippi

plantation, and continued to reside there until late in October, 1863.

Upon the surrender of Vicksburg on July 4th, 1863, to the federal forces under General Grant, the surrounding country was overrun and largely devastated by the troops. By general order No. 50, issued by General Grant, at Vicksburg, on August 1st, 1863, it was provided that persons having cotton or other produce not required by the army, would be allowed to bring the same to any military post within the State of Mississippi, and abandon it to the agent of the Treasury Department at said post, to be disposed of in accordance with such regulations as the Secretary of the Treasury might establish.

Pearce Noland had 69 bales of cotton on his plantation, near the Big Black bridge, and within shipping distance of the railroad running out of Vicksburg, eastwardly. This railroad had been taken over by the federal government, and was operated as a United States military railroad.

Pearce Noland was then in delicate health, although it is not made clearly to appear to what extent he was disabled from attending to business.

It is claimed by the appellants that Pearce Noland's cotton was seized by the federal troops and carried to Vicksburg. The testimony, however, as to the seizure, is quite vague and indefinite. The first bit of reliable evidence relating to the story of Pearce Noland's 69 bales of cotton is found in the following receipt found in the archives of the War Department:

"Received, Vicksburg, Mississippi, October 8th, 1863, of Mr. P. Noland, three hundred and forty-five dollars, being freight on 69 bales cotton transported to Vicksburg by United States military railroad.

"J. D. BINGHAM,
"Lieut. Col. and Chief Q. M. Dept., Tenn."

It will be observed that this receipt does not indicate that the 69 bales of cotton in question had been seized by the federal troops; on the contrary, the fact that Pearce Noland paid $345.00 freight thereon to Vicksburg, would raise the presumption that he was the shipper of his cotton. However that may be, the Nolands experienced quite a good deal of trouble in getting their 69 bales shipped out of Vicksburg.

It is contended by the appellants that Pearce Noland, being a Southern sympathizer, could accomplish nothing toward liberating his cotton, and that Mrs. Noland, through her personal efforts with Generals Grant and Logan, finally succeeded in getting 69 bales of cotton turned over to her, as appears from the following permit:

"Headquarters, Commander of the Post.

"Vicksburg, Miss., October 12, 1863.

"Mrs. P. Noland has permission to ship 69 bales of cotton marked (P. N.) to Memphis, Tennessee.

By order of Maj. Gen. JOHN A. LOGAN,

JNO. S. HOOVER,

Lieut. and A. D. C."

Evidently Pearce Noland's 69 bales became intermingled with other cotton beyond identification, and that the 69 bales of cotton delivered to the Nolands was a part of 114 bales taken from the plantation of J. & M. Britton. The 69 bales were shipped to Yeatman, U. S. Treasury Agent at Memphis, by C. A. Montross, Treasury Agent at Vicksburg, *per* the Steamer J. S. Pringle, on October 24th, 1863, before Pearce Noland's mark ("P. N.") could be put on the bales.

Shortly after the 69 bales were received by Yeatman at Memphis, an order was presented to him by the agent of the Nolands, signed by General Grant, for the 69 bales of the cotton that had been shipped from Vicksburg. At first Yeatman declined to surrender the cotton; but the agent subsequently returned accompanied by Brigadier General James C. Veatch, the commander of the post at Memphis, who insisted on the delivery of the cotton pursuant to General Grant's order; and General Veatch having endorsed his name upon the order, Yeatman surrendered the cotton. According to Yeatman, Mrs. Noland did not claim this cotton as her own, but said that 69 bales of her cotton had been taken, and that General Grant had given her an order for the delivery of the same number of bales, out of some other lot. The remaining 45 bales of the 114 bales were shipped to Cincinnati, and sold for 78 1-4 cents per pound.

The Nolands departed with their 69 bales, and presumably sold it for about the same price, although there is nothing in the record to show precisely what they received for it.

Pearce Noland and his wife thereupon returned to Shelby County, and spent the following winter of 1863-4 with Mrs. Noland's mother.

On January 23rd, 1864, Pearce Noland bought the farm of 303 acres (of which 200 acres are now in controversy), from Fielding Neel and J. A. Glass, for $21,-249.80. Of this sum he paid $14,000.00 in cash, and gave his four notes for $1,812.45 each, for the remainder of the purchase money. The deed recited that Pearce Noland had made the cash payment of $14,000.00, and had executed his four notes for the deferred payments.

The deed contained the following clauses:

"To have and to hold the above two described tracts of land, together with all and singular the appurtenances thereunto belonging unto the said Mary E. Noland, her heirs and assigns forever, for and to the sole and separate use and benefit of the said Mary E. Noland and such children as may hereafter be born unto her by her husband, Pearce Noland, and with the consent of her said husband given in writing the said Mary E. Noland shall have the right and privilege to sell, transfer, exchange or dispose of all or any part of the land hereinbefore mentioned, for such price and to such person or persons as she may desire, and to reinvest all or any portion of the proceeds or not, as she may deem most expedient, but if reinvested to be held by her as aforesaid, and for the purpose aforesaid, and in case she should survive her said husband, she shall have such rights and privileges without his consent so given; the proceeds in this event shall be reinvested for the purposes hereinbefore mentioned.

"This indenture further witnesseth: That upon the decease of the said Mary E. Noland, the above property in whole or in part or the proceeds thereof if reinvested shall go to the said Pearce Noland or his heirs, in the event there is no issue of the body of the said Mary E. Noland by her husband, Pearce Noland living at the time of her death, but if there be such issue then living then the same shall go in fee simple to such."

Pearce Noland occupied the Kentucky farm, as a home, from 1864 until his death in 1876.

Under the power thus given her, Mrs. Noland sold 103 acres of the farm to Reuben Scobee in February, 1875, for $4,120.00, and Pearce Noland signed the deed in indication of his consent thereto.

Pearce Noland died in 1876, leaving no issue; and his widow, Mary E., married Fielding Neel in the winter of 1878. She was ever afterwards known as "Bettie Neel." Fielding Neel died on September 21st, 1881; and his widow, Bettie Neel, died on October 8th, 1913, leaving a will by which she devised the Shelby county farm to her nieces and nephews, who are the appellants.

This action was instituted by the heirs at law of Pearce Noland against the devisees under Bettie Neel's will, to recover the farm in question. The devisees claim that Bettie Neel having furnished the consideration, and the deed having been taken in the form it was taken, without her consent, a trust thereby resulted to her whereby she held and owned the farm in question; and the circuit court having decided against them, they appeal.

The appellants introduced only three witnesses to sustain their claim.

John T. Ballard testified that he wrote the deed in 1864, in the presence of Pearce Noland, the grantee, and Neel and Glass, the grantors therein; that Pearce Noland directed him to add the clause which created a remainder in the heirs of Pearce Noland upon the failure of issue of his marriage with Mary E. Noland; that Pearce Noland told him he had paid the $14,000.00 in cash; and that when the witness suggested to Pearce Noland that he had already given the farm to his wife to do with as she pleased, and to sell and to reinvest the proceeds as she pleased, Pearce Noland answered that he wanted the reversionary clause added to the deed, and it was done.

Ballard further testified that James McGaughey, a brother of Bettie Neel, was the first to notify her, in 1881 after the death of her second husband, Fielding Neel, of the reversionary clause in the deed. It is claimed she did not know of it at the time the deed was made, or at any time before 1881. But Ballard's testimony upon this point is but a repetition of what James McGaughey told him.

John R. Deering, the executor and principal devisee under the will of Bettie Neel, identified a diary which Pearce Noland had kept, in which he spoke of the farm in controversy as "my farm;" and further testified that Mrs. Neel spent exceeding $850.00 for improvements or betterments on the farm after Pearce Noland's death. The remainder of his testimony is immaterial.

The third and last witness is Miss Emma McGaughey, a niece of Mrs. Neel, who frequently saw her aunt while she lived with the witness' grandmother after her return to Kentucky in the winter of 1863-4. The witness was then less than sixteen years of age. Her testimony consists of a narrative of family lore, and is largely concerned with the war conditions of the South, which she acquired from hearsay. She says her parents and other relatives told her that Pearce Noland's cotton had been confiscated; that Mr. and Mrs. Noland and the witness' father had obtained an order for the cotton and transportation for it and the family to Memphis in 1863; and, that both Mr. and Mrs. Noland and the witness' father went to Memphis, sold the cotton, and collected the proceeds.

Miss McGaughey is the only witness by whom appellants attempted to prove that Pearce Noland agreed to invest the cotton money in the farm and take the title to his wife; and her testimony is found in the following questions and answers:

"Q. 40. What was the agreement, if any, between Mr. P. Noland and his wife, Bettie Noland, concerning that investment? State what they each said to the other so far as you heard it, or heard Mr. P. Noland recite it? A. I know of no agreement, but heard them discussing at various times as to the safest investment. My aunt seemed to prefer investing in a farm and they looked at several and decided to buy, which he did.

"Q. 41. Relate the circumstances of the investment by Mr. P. Noland in the farm bought from Neel and Glass, in Shelby County, Kentucky, January 7th, 1864, so far as you heard Mr. P. Noland state them to his wife, Bettie Noland, or as she may have stated them in Mr. P. Noland's presence and hearing? A. I was at my grandmother's in the living room with my parents, grandmother, and my aunt Mrs. Noland. Mr. Noland returned from town and told his wife that he had bought the farm from Neel and Glass for her, and had Mr. John Ballard write the deed in her name, and record it."

She further testified that her aunt did not know at the time of the purchase of the Shelby county farm, that the title had been taken to her for life only, with remainder to the heirs of Pearce Noland upon failure of issue. But it should not be overlooked that practically all of her testimony, with the exception of that part which related

to the statement of Pearce Noland to his wife at the time he bought the farm, is hearsay, given fifty years afterwards.

Furthermore, the statement attributed to Pearce Noland that he had bought the farm for his wife, and had taken the deed in her name, was not inconsistent with the deed as it was written, since it did convey the land to her upon the reasonable conditions therein stated.

It appears that Pearce Noland subsequently became insolvent through endorsements for his brothers; and, at the time the Kentucky farm was bought, his Mississippi plantation was, by reason of war conditions, an incumbrance rather than an asset.

And there is this further significant fact, that although Mrs. Noland certainly knew the provisions of the deed which she at first claimed was a mistake as early as 1881, thirty-one years before her death, she never took any action towards correcting the mistake, or asserting her alleged title.

The argument of counsel for appellants rests upon the following propositions: (1) that the 69 bales of cotton originally belonged to Pearce Noland; (2) that his title thereto was devested, and placed in the federal military authorities by the seizure of the cotton; (3) that General Grant then gave the cotton to Mrs. Noland; (4) that she sold it and turned over the proceeds of sale to her husband for investment; and (5) that he, in violation of the trust, and without her consent, bought the Shelby county farm and took the deed in her name, for life only, instead of in fee.

Section 2353 of the Kentucky Statutes under which appellants claim a resulting trust, reads as follows:

"When a deed shall be made to one person, and the consideration shall be paid by another, no use or trust shall result in favor of the latter, but this shall not extend to any case in which the grantee shall have taken a deed in his own name without the consent of the person paying the consideration, or where the grantee, in violation of some trust, shall have purchased the lands deeded with the effects of another person."

This statute abolishes the old equitable doctrine of resulting trusts except in two cases: (1) where the title is taken in the name of the nominal purchaser without the consent of the real purchaser, and (2) where the grantee, in violation of some trust, buys the land with

the money or property of another. Foushee v. Foushee, 163 Ky., 524.

In view of the well established doctrine in this jurisdiction upon the subject of resulting trusts, we hardly deem it necessary to again review the authorities at length. It will be sufficient to point out the general rule, and to refer merely to the leading cases upon the subject, which are uniform in their scope and application.

In 39 Cyc., 166, the rule is stated, as follows:

"In order to establish a resulting trust by parol evidence, as against the holder of the legal title to property, the proof of all the essential facts and circumstances must, as a general rule, be clear, full, convincing, and satisfactory, and of such a character as to disclose the exact rights and relations of the parties, and take the matter out of the realm of conjecture or presumption, especially after a long lapse of time; and where the evidence is uncertain, conflicting, doubtful, or unsatisfactory, or is capable of reasonable explanation on a theory other than the existence of a resulting trust, no trust will be held to be established. The language used by the courts, however, in stating this rule has not been by any means uniform; but it has been variously stated that the proof must be clear and unequivocal, most convincing and irrefragable, clear and unquestionable, clear and undoubted, or so clear, strong, and unequivocal as to banish every reasonable doubt of the existence of such trust; or if the evidence is wholly by parol that it should be received with great caution. Thus to raise a trust between members of the same family, as between husband and wife, or father and son, the evidence must be positive and free from all ambiguity; and loose and general expressions of intention, in common conversation, acknowledging a general obligation, etc., will not be sufficient."

See Devlin on Real Estate (3rd ed.), volume 2, section 1183, to the same effect.

In the late case of May v. May, 161 Ky., 114, the question was considered at length.

In that case one Allen Leslie, in 1847, conveyed a tract of land to his son-in-law Thomas P. May, the deed reciting the consideration to be the love and affection which the grantor had for his daughter, the wife of May, and $1,100.00 in cash paid by Thomas P. May. The deed contained no restrictions upon the title, but certain grandchildren of Thomas P. May, being dissatisfied with

the provision made for them by their grandfather's will, brought an action, claiming a resulting trust for the benefit of the children and heirs-at-law of their grandmother, who was the wife of Thomas P. May.

The opinion called attention to the fact that it had not been shown that the grandmother had ever claimed the land was held in trust for her; and there, as here, the deed truly recited that the cash payment had been made by the husband.

Allen Leslie lived thirty years after making the deed; in the case at bar Pearce Noland lived twelve years after the deed was made to the Shelby county farm, and Mrs. Noland lived forty-nine years thereafter.

After conceding that a resulting trust might be established by parol proof, and that numerous cases so holding appear in the books, the court, in the May case, quoted with approval the following passage from the opinion in Nelson v. Nelson, 29 Ky. L. R., 885, 96 S. W., 794:

"But these were cases in which it was clearly made to appear, either that the deed to the land conveyed was received by the grantee under an agreement with the grantor, or one paying the consideration, to hold the title in trust for a third person, or where the grantee in violation of a trust purchased the land with the means of another. There are yet other cases in which, upon parol evidence of a secret trust in behalf of an insolvent debtor, created by his act in conveying or causing to be conveyed to another property which, but for such conveyance, would be liable for his debts, the courts, at the suit of creditors, have declared the conveyance a fraud upon them, and subjected the property to the payment of his debts."

In the May case, the court also quoted from Devlin on Real Estate (3rd ed.), section 1183, as follows:

"As it is sought in attempting to establish a resulting trust to raise an equity superior to the deed, and thus give it an effect not apparent upon its face, the proof that one other than the grantee is beneficially interested must be clear and convincing. We recognize the doctrine to the fullest extent, and such is the uniform holding in all the cases that where a right or title is claimed against a writing, in this or any other class of cases, where it is permitted at all, it must be sustained by proof of the most convincing and irrefragable char-

acter. The courts have been deeply impressed with the danger of this kind of proof, as tending to perjury and insecurity of paper titles. Kent and other eminent judges regret that the doctrine was ever introduced, as it opens a wide door to frauds and perjuries, which the statute was intended to close.  *  *  * This rule is based upon the soundest legal principles, for the parol proof must of necessity be the testimony of witnesses as to what the parties have said or verbally agreed to—a class of testimony notoriously weak—and the fact to be overturned is a writing, the best evidence as to where the legal title is.''

This doctrine is fully established in this jurisdiction by a long line of decisions. Snelling v. Utterback, 1 Bibb, 609; Northcut v. Hogan, 4 Ky. L. R., 364; Pool v. Thomas, 10 Ky. L. R., 92; Nelson v. Nelson, 29 Ky. L. R., 885; Couch v. Sizemore, 32 Ky. L. R., 641, 106 S. W., 801; Roach v. George's Exor., 93 Ky., 609; Helm's Exor. v. Rogers, 81 Ky., 568; Smith's Admr. v. Beswick's Admr., 113 Ky., 439; Taylor v. Fox's Exor., 162 Ky., 804; Foushee v. Foushee, 163 Ky., 524.

Under this explicit rule, it is clear that the evidence in this case fails signally to establish the resulting trust claimed by appellants. It neither clearly nor satisfactorily appears that the cotton was seized by the United States military authorities, or that the proceeds of the sale ever belonged to Mrs. Noland, or were ever in her possession, or that the deed was drawn contrary to her wishes. To establish a trust in behalf of Mrs. Noland under these facts, when taken in connection with the long period of fifty years during which this deed has stood unquestioned and unattacked, would be stretching the doctrine of resulting trust far beyond any instance reported in the books. To satisfy the rule, the proof offered to establish the trust claimed must be clear, full, convincing, and satisfactory. It has none of these essential qualities.

2. But, if we should be mistaken in this conclusion, and it should be assumed that the evidence did clearly, fully and satisfactorily show that Pearce Noland's property had been seized by the military authorities as claimed, and that the cotton had been presented to Mrs. Noland by General Grant, and that Mrs. Noland thereby became the owner of the property, it is nevertheless true that Pearce Noland reduced this property to possession

while living in Kentucky, in 1864, and he thereby became the absolute owner of it, under the law as it then stood. This transaction occurred about thirty years before the passage of the Married Woman's Act of 1894, which freed the wife's property from many of the common law rights of the husband. Under the law as it stood in 1864, the husband, by virtue of his marital rights, might reduce his wife's general estate to possession, and thereby make it his own. Williams v. Coffman, 31 Ky. L. R., 151; Rose v. Rose, 104 Ky., 48, 41 L. R. A., 353; 84 Am., St. Rep., 430; Mitchell v. Violett, 104 Ky., 77; Phillips v. Farley, 112 Ky., 837; Helm v. Board, 114 Ky., 289; Bennett v. Bennett, 134 Ky., 444; Fowler v. Fowler, 138 Ky., 326.

There is no proof that the cotton money ever became the property of Mrs. Noland; but if it should be so treated, there can be no doubt that it was her general estate, or that Pearce Noland reduced it to possession, thereby making it his own property, absolutely. And, the claim that Mrs. Noland's patrimony of $3,500.00 was used by her husband in the purchase of the farm, if true, stands upon precisely the same footing.

The contention that Pearce Noland did not reduce his wife's property to possession, and that he held it for her in trust, is not sustained by any competent evidence.

3.    But if we should be mistaken in this last position, and it should be granted that the federal troops seized Pearce Noland's cotton, and that General Grant presented it to Mrs. Noland, precisely as she claimed, and that Pearce Noland never reduced it to possession, we still are confronted by the proposition, which cannot be successfully controverted, that no act of the military forces of the United States, or any officer thereof, could, under the law, devest Pearce Noland of his title to the cotton in question.

In 40 Cyc., 332, the rule is stated, as follows:

"Private property on land not being used in aid of the war is not subject to confiscation by the rules of international law. Private property may be seized, however, when needed in the course of military operations; but upon the conclusion of peace it should be restored or compensation made.

"A belligerent nation may, by a valid municipal law, authorize the confiscation of private property of the enemy.

"In the United States, since the adoption of the federal constitution, the sole power of authorizing confiscation of the enemy's property had been vested in Congress as an incident to its war powers.

"During the Civil War several important confiscation acts were passed by Congress.   *   *   *

"Provision was also made by special legislation during the Civil War for the holding of captured and abandoned property."

Accordingly, it was provided by the Abandoned and Captured Property Act of Congress, approved March 12th, 1863 (12 Stat. at L., 1266), that the title to any property, except that used in actual hostilities, could not be devested in the insurgent states, unless in pursuance of a judgment rendered after due legal proceedings. By that act, the federal government constituted itself the trustee for those who were entitled to the proceeds of abandoned and captured property, with the exception above stated.

The federal government recognized to the fullest extent the humane maxims of the modern law of nations, which exempt private property of non-combatant enemies from capture as booty of war.

The scope and effect of the act of March 12th, 1863, *supra*, was fully considered in the case of United States v. Klein, 12 Wall, 128, in an able opinion by Chief Justice Chase. It was there held that the title to the proceeds of property which came into the possession of the federal government by capture or abandonment, with the exception above referred to, was in no case devested out of the original owner, and that it was for the government itself to determine, and not its military officers, whether these proceeds should be restored to the owner.

The act of 1863 directed the officers of the treasury department to take into their possession and make sale of all property abandoned by its owners, or captured by the national forces, and to pay the proceeds into the national treasury. It was then for the court of claims to determine, by a proper trial, whether the proceeds should be restored to the owner of the property. The title of the original owner was not disputed; but he could only recover his property or its proceeds by proving his loyalty to the government of the United States. Otherwise it remained with the government.

See also the case of Mrs. Alexander's Cotton, 2 Wall, 404; U. S. v. Padelford, 9 Wall, 531; Lamar v. Brown, 92 United States, 187; Walker's Exors. v. United States, 106 U. S., 413; Austin v. United States, 155 U. S., 424; Rice v. United States, 21 Ct. Cl., 419.

It follows, therefore, that the act of General Grant in delivering the cotton to Mrs. Noland, even though it happened precisely as is claimed by appellants, did not affect Pearce Noland's title thereto. And, in justice to the memory of General Grant, it should be said that he did nothing that can be construed as a violation of the act of March 12th, 1863. He did not attempt to confiscate the cotton in question, or to devest Pearce Noland's title thereto. On the contrary, he fully recognized that title by directing a surrender of the cotton to its owner. There is evidence in this record that Pearce Noland was a Union man, and not a Confederate; and if that were true, his cotton was not liable to seizure. And, as heretofore stated, there is no competent evidence, that it was seized by the military authorities.

It must follow, therefore, under any view of the case, that appellants have failed to sustain their claim to a resulting trust in the Shelby county farm, and that the chancellor properly so held.

4. The appellees prosecute a cross-appeal from so much of the judgment as refused them a recovery of the $4,120.00 realized from the sale of the 103 acres to Scobee in 1875; and, also from so much of the judgment as denied a recovery of the $850.00 which was paid to Mrs. Neel in 1895 by the Louisville & Nashville Railroad Company for a right-of-way through the farm.

Appellees admit, however, that they have been unable to make any direct proof of any reinvestment of the $4,120.00 received from Scobee; and, as it was sold during the lifetime of Pearce Noland, no presumption will be indulged that the money was received or spent by her, or that it was reinvested under the clause of the deed permitting but not requiring reinvestments during Pearce Noland's life. But the $850.00 received from the railroad company in 1895 was received after the death of Pearce Noland; and, under the later provision of the deed requiring a reinvestment of the proceeds of all sales made after his death, it is insisted that Mrs. Neel's estate is liable for the last named sum.

It is stipulated of record, however, that Bettie Neel, about the year 1903, erected upon the farm in question a tobacco barn, at a cost of more than $850.00, and that said barn is still on the farm.

As above stated, Mrs. Neel was required by the deed to reinvest this money for the benefit of the remainder-men; and, it is clear from the proof that she did invest or spend a great deal more than $850.00 in permanent improvements upon the farm after Pearce Noland's death.

A life tenant is not bound to make any permanent improvements on the estate; and, if he should make them, it will be presumed they were made for his own benefit, and he will not be permitted to recover anything therefor from the remainderman or the reversioner. 16 Cyc., 630; Johnson v. Stewart, 8 Ky. L. R., 857; Nineteenth & Jefferson Street Presbyterian Church v. Fithian, 16 Ky. L. R., 581, 29 S. W., 143; Caldwell v. Jacob, 16 Ky. L. R., 21.

But that is not this case. There is no attempt here upon the part of the life tenant's executor to recover this $850.00, or any sum. It is merely claimed, by way of defense, that she reinvested this money upon the farm, by improving it to that extent; and that the farm, thus improved, goes to the remaindermen. We think this was a sufficient compliance with the requirements of the deed.

Judgment affirmed upon both original and cross-appeal.