## Potter v. Potter.

(Decided April 30, 1918.)

### Appeal from Letcher Circuit Court.

1. Trusts—Parol Trust—Establishment—Character of Evidence.—In order to show a parol trust against the holder of the legal title, the evidence must be clear, convincing and satisfactory and such as to take the case out of the realm of conjecture; and where the evidence is uncertain, conflicting, doubtful or unsatisfactory, or is susceptible of a reasonable explanation on a theory other than the existence of a trust, no trust will be established.

2. Trusts—Parol Trust.—In an action by plaintiff to recover land on the ground that it was conveyed to the defendant in trust for him, evidence examined and held insufficient to establish the trust.

HAZELRIGG & HAZELRIGG, J. P. HOBSON & SON, DAVID HAYS and F. G. FIELDS for appellant.

D. D. FIELDS, R. M. FIELDS, H. C. FALKNER and ED. C. O'REAR for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming.

Plaintiff, J. M. Potter, brought this suit against A. B. Potter, John Dean Stevens, and the Hamilton Realty Company to recover a tract of 150 acres of land located in Pike county, on the ground that the land was conveyed by Abraham Potter to A. B. Potter in trust for plaintiff, and that John Dean Stevens and the Hamilton Realty Company purchased the property with notice of the trust. From a judgment in favor of the defendants, plaintiff appeals.

It appears that Abraham Potter died on May 13, 1913, age 75. He was survived by W. H. Potter, K. S. Potter, and Sarah Ann Brummett, children of his first wife, and by Albritton Potter, J. Martin Potter, Rebecca J. Addington and Creed Potter, children of his last wife, Sarah, who also survived him. Creed Potter, after his conviction of a felony, escaped and has never been heard from since. On November 23, 1903, Abraham

Potter, who was then about 65 years of age, conveyed to his son, A. B. Potter, for "love and affection," a tract of 150 acres of land. On the same day he conveyed to A. B. Potter another tract of land of 150 acres for the recited consideration of $10.00. The latter tract is the subject of this controversy. On May 23, 1913, a few days after Abraham Potter's death, A. B. Potter conveyed the tract in controversy to John D. Stevens for the recited consideration of $1.00, but for an actual consideration of $18,720.00. Thereupon Stevens conveyed the same tract to the Hamilton Realty Company, for the same consideration.

This suit was first brought by J. Martin Potter, W. H. Potter, K. S. Potter, Rebecca Addington, Sarah Ann Brummett, children, and Sarah Potter, widow, of Abraham Potter, deceased, to recover the land in dispute on the ground that it was conveyed by Abraham Potter to A. B. Potter, to hold in trust for Abraham Potter. After the proof had been taken, J. Martin Potter filed an amended petition alleging that the conveyance to A. B. Potter was made in trust for him and that Stevens and the Hamilton Realty Company purchased with notice of the trust. At the same time the other plaintiffs filed an amended petition disclaiming any further interest in the land and withdrawing from the action.

According to the evidence for plaintiff, he went on the land about the year 1895 and remained there until the year 1900, under promise from his father that he was to have the land. He then got into some trouble with his wife, and placing his children in the care of his father, went to the state of North Carolina where he remained five or six years. W. H. Potter, a half brother of J. Martin Potter and A. B. Potter, and who took the acknowledgment of the deed, says that his father, Abraham Potter told him that he wanted the land to go to Martin, who was then in trouble; and that if Martin ever settled down, he wanted him to have it, but if he didn't, he wanted his children to have it. He further said that A. B. Potter afterwards admitted to him that he held the land in trust for Martin. On another occasion he tried to buy the land for the company when A. B. Potter stated that it was his father's land and he would deed it back to his father, but they would have to pay him what they owed him. K. S. Potter tes-

tified that his father talked to him of deeding the property to his brother, Henry Potter, in trust for Martin. After that his father told him that he had decided to deed it to "Brit," that he thought Brit would deed it over to Martin when the latter got out of trouble with his wife. Brit told him that if Martin or they would pay him $350.00, he would deed the land to his mother. Rebecca Addington, a sister, who was twelve years old when the deed was made, says that she heard her father and W. H. Potter discussing the deed when the former signed it and that "he finally decided to make it to A. B. Potter in trust for Martin Potter." She further stated that A. B. Potter was not present when the deed was signed and acknowledged by Abraham Potter, and that A. B. Potter on one occasion told her that they wanted him to deed the land to Martin, which he declined to do, but that he would make a deed to his mother and father. John H. Addington, husband of Rebecca, testified that after the sale to Stevens and the Hamilton Realty Company, A. B. Potter wanted to know if his mother had heard of the sale and stated that if Martin, Rebecca and his mother wanted to do the right thing about it, he would do them right. Sarah Potter, the mother of Brit Potter and Martin Potter, stated that her husband wanted A. B. Potter to deed the land back to J. Martin when the latter returned from North Carolina. A. B. said that he would deed it to her but not to Martin. She further testified that her understanding of the agreement between her husband and A. B. Potter was that A. B. was to deed it back to her husband when he wanted it. David Hays, an attorney who represented the Holbrooks in a boundary suit against Abraham Potter and A. B. Potter, stated that during the proceedings A. B. told him that he could prove by his father and every brother and sister that he had, that his father had no interest in the land, but that it was conveyed to him (A. B. Potter) for his brother Martin. William B. Holbrook, who was present when this conversation occurred, testified to the same effect. Isaac Potter, Jr., a nephew, testified that Abraham Potter told him that Brit had gotten a deed of trust on Martin's place to protect Martin from his wife. Matilda Potter stated that Abraham Potter told her that he had been to see Brit to get him to deed the property over to Martin, but that Brit would not do it, and he didn't think Brit would treat him that

way. Jane Potter Rogers, a granddaughter of Abraham Potter, said that she had often heard him say that he had deeded the land to Brit for Martin. It was also shown that in the settlement of the boundary suit between A. B. and Abraham Potter and the Holbrooks, A. B. conveyed to the Holbrooks four or five acres of land after he had conveyed the minerals to J. Martin Potter. There was further proof that Abraham Potter frequently exercised acts of ownership over the land after it was deeded to A. B. and on two or three occasions hauled the corn to his home for the use of himself and Martin's children.

On the other hand it was shown by the defendant, that Abraham Potter had incurred considerable indebtedness in the defense of his son, Creed Potter. After that time he conveyed various tracts of land to his children, and a tract of from 300 to 700 acres to his wife, Sarah, which he claimed to have acquired through her. In this list of indebtedness was a mortgage to Boreing for $323.00, and certain executions amounting to $375.00. These were paid by the defendant, and Abraham Potter gave him credit for cash amounting to $75.00, and merchandise amounting to $188.62. The conveyance to A. B. Potter was made in consideration of his discharging this indebtedness and in settlement of the merchandise account, etc. It was further shown that in the Holbrook suit, Abraham Potter filed an answer disclaiming any interest in the land and stated that the land belonged to Brit. Burt Toliver testified that he heard a conversation between Abraham Potter and A. B. Potter in which A. B. said that he would deed the land back if they would pay him his money and interest, whereupon Abraham stated that he had deeded the land to Brit and had never asked him to deed it back; that he could not pay the money because he did not have it. In the year 1904, J. L. McCormick, agent for the Mineral Development Company, wanted to buy the land in dispute. He approached Abraham Potter for that purpose and Abraham stated that the title was in Brit and Brit could do as he pleased with it. About two years later, McCormick hired Abraham Potter to go with him to see Brit. Whereupon Abraham Potter again stated that it was Brit's land and he could do as he pleased with it. H. M. Collier, who was present with McCormick on the last occasion, testified that Abraham Potter told Brit that if he wanted to sell

the land, it was all right with him. At that time Brit stated that he didn't care to sell the land because the old man was getting childish and he did not want to do anything to contrary him. In talking with his attorney, D. D. Fields, Abraham Potter frequently stated that A. B. Potter owned the land. Soloman Yontz, who wanted to rent the land, spoke to Abraham Potter about it. Abraham replied that he had nothing to do with it and told witness to go see Brit about it. Abraham Potter also told Solomon Hall that the land did not belong to him but belonged to Brit. When Sam Bentley, the school tax collector, went to see Abraham Potter about his taxes, Abraham Potter told him that Brit should pay the taxes on the land and he did. Geo. W. Holbrooks testified that Abraham Potter told him that he had sold the land on Potter's Fork to A. B. Potter. W. M. Holbrooks testified to the same effect. George Ison stated that he heard Abraham Potter say that the land in controversy was Brit Potter's land. It was further shown that for every year after 1904 A. B. Potter paid the taxes on the land and listed it as he did his other lands. There was also evidence to the effect that A. B. Potter lived on the land for a while, cultivating and using it as his own, and rented it to others and appropriated the rents to his own use. During this time he was never asked by Abraham Potter, or J. Martin Potter, to account for the rents. It was also shown that A. B. Potter made valuable improvements on the land at a cost of about $1,000.00.

In rebuttal it was shown by the sheriff that Abraham Potter and not A. B. Potter paid the money due on the executions, and that Abraham Potter satisfied his indebtedness to Brit by letting him have a mule.

It is the well-established rule in this state that in order to show a parol trust against the holder of the legal title, the evidence must be clear, convincing and satisfactory, and such as to take the case out of the realm of conjecture; and where the evidence is uncertain, conflicting, doubtful, or unsatisfactory, or is susceptible of a reasonable explanation on a theory other than the existence of a trust, no trust will be established. Neel's Exo'r v. Nolan's Heirs, 166 Ky. 455, 179 S. W. 430; Taylor v. Fox's Exor's, 162 Ky. 804, 173 S. W. 154; Roche v. George, 93 Ky. 609, 20 S. W. 1079. It will be observed that no witness testified that he was present when the deed was delivered and that the grantor stated to the

grantee that the land was conveyed to him in trust for J. Martin Potter, or that the grantee accepted the deed with that understanding. On the contrary, the evidence tending to establish the trust consists principally of statements alleged to have been made by the grantor when the grantee was not present and of admissions alleged to have been made by the grantee which are denied by him. Evidence of this character is always received with great caution and is not generally regarded as sufficient to establish a trust where it does not square with the conduct of the parties and the evidence to the contrary is equiponderant. Even if it be conceded that J. Martin Potter's trouble with his wife furnished a reason why his father should have conveyed the land to A. B. Potter in trust for him, it is equally true that when that trouble ended and he returned to Kentucky in 1905 or '06, no reason then existed for a continuation of the trust. If then a trust existed, J. Martin Potter would naturally have taken steps to enforce the trust during the lifetime of his father when the trust could have been established by clear and undoubted evidence. Aside from two or three conversations in which he claims that he and his father requested that the land be conveyed to him, he took no steps during the several years that transpired after his return to Kentucky to recover the land until after his father's death. On the other hand the proof is clear that A. B. Potter himself lived on the land for a while and placed thereon numerous tenants from whom he collected the rents. Not only so, but he listed the land with his other property and paid the taxes thereon for a number of years. In addition to this, he placed improvements on the land of the value of several hundred dollars. Here then we have a case where the oral evidence relied on by plaintiff tends almost as strongly to establish a trust in favor of his father as it does to establish a trust in his favor, while the oral evidence relied on by the defendant tends to show that his father always recognized the fact that the title was in him and that he could do as he pleased with the land. Furthermore the conduct of the parties was such as to indicate that no trust existed. Under these circumstances we agree with the chancellor that the evidence was not of that clear, convincing and satisfactory character necessary to the establishment of a trust.

Judgment affirmed.